Vernon Frank STONE,
Petitioner-Appellant,

v.

W. J. ESTELLE, Director, Texas
Department of Corrections,
Respondent-Appellee.

No. 76–3820.

United States Court of Appeals,
Fifth Circuit.

Aug. 4, 1977.

Norman R. Miller, Dallas, Tex. (Court appointed), for petitioner-appellant.

W. Barton Boling, Asst. Atty. Gen., El Paso, Tex., John L. Hill, Atty. Gen., Joe B. Dibrell, Asst. Atty. Gen., David M. Kendall, Jr., First Asst. Atty. Gen., Jack B. Boone, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before AINSWORTH and HILL, Circuit Judges, and LYNNE,* District Judge.

AINSWORTH, Circuit Judge:

Appellant Vernon Frank Stone was convicted by a Texas jury of murder with malice, and punishment was assessed at twenty-six years' imprisonment. The conviction was affirmed by the Texas Court of Criminal Appeals. *Stone v. State,* 1974, 510 S.W.2d 612 (Tex.Cr.App.). Stone then filed a state court petition for habeas corpus which was denied, as was his application in the federal court below, from which this appeal was taken.

The issue before us is whether impeachment cross-examination by the prosecutor of the defendant, Stone, regarding his post-arrest exercise of constitutional rights, and subsequent prosecutorial comment to the jury to the same effect constituted reversible error in the circumstances of this case. Though the challenged prosecutorial statements amount to overreaching, the error, if any, was harmless in the situation at bar. Therefore, we affirm.

It is undisputed that appellant Stone shot and killed the victim, Cornish. Stone's defense, however, is that the shooting occurred in self-defense and without malice. One witness testified at trial that he saw Stone standing with a pistol in his hand outside the Am Vets Club in Odessa, Texas, and that Stone approached Cornish, swore at him and was persistently belligerent. According to the witness, the victim did nothing to provoke appellant, yet Stone shot him in the left eye.

Testifying in his own behalf, Stone said that Cornish had started an argument with him in the club's restroom, in which only the two men were present, and had revealed a gun that Cornish was carrying in his waistband and had threatened to kill Stone. In the subsequent shooting incident outside, Stone testified, the victim raised his shirt up and started to reach for his pistol, at which point Stone, who had his own gun, shot in Cornish's direction, turned and ran. Stone said that he intended to shoot over Cornish's head to scare him and did not know whether he, Stone, had hit him.

Plainly, the evidence of guilt in this case was very strong, and the jury apparently disbelieved Stone's testimony about self-defense.

Stone's contention on appeal is that the prosecutor improperly commented on his post-arrest exercise of his right to have an attorney and to remain silent. Stone argues that such comment may have produced an "aura of guilt" which influenced the jury to disbelieve his self-defense story and thus may have contributed to his conviction. The contention is thus based on Stone's constitutional rights under the sixth amendment, the due process clause of the fourteenth amendment and, by implication, the fifth amendment.

The sequence of questioning and comment in controversy was as follows. On direct examination, Stone testified that, at the time he was arrested, he was on his way to the courthouse building to turn himself in, and that he did not attempt to flee the arresting officers.[1] Based on that testimo-

---

* Senior District Judge of the Northern District of Alabama, sitting by designation.

1. The following colloquy occurred:
   Q. At the time that you were arrested, where were you going to?
   A. I was going to right here.

   Q. Why were you coming to the courthouse?
   A. To give them the gun and turn myself in.
   Q. At the time you were arrested which direction were you walking?
   A. I was walking towards right here, I was walking south on Hancock.

ny, the prosecutor began his cross-examination by asking Stone whether he was seeking to indicate that he had cooperated with the police. Stone answered affirmatively.[2] The prosecutor then asked about Stone's refusal to participate in a lineup, and elicited Stone's statement that he had asked for an attorney.[3] In the jury argument, defense counsel pointed out that Stone had not attempted to flee town after the incident, and that he was walking toward the courthouse when he was arrested.[4] Later, in the prosecution's argument to the jury, there was comment on the issue of defendant's cooperativeness with the police. The prosecutor stated, among other things, that Stone had not turned himself in immediately and that he would not tell the police anything but had asked for an attorney.[5]

The state's position on appeal is that the prosecutor's remark was not improper but was made in response to the statements of defendant and his attorney. The state argues that the prosecutor was legitimately challenging the assertions that Stone was turning himself in and was, as a general matter, cooperative with the police. Even if such a "challenge" (the state's word for the impeachment attack) was improper, the state contends, the attack did not render the trial fundamentally unfair or constitute a denial of due process, but at worst was harmless error.

The disputed prosecutorial line of questioning and comment was unwarranted. However, even though we do not approve of such prosecutorial tactics, the question we must decide is whether the few remarks at issue produced a trial which was fundamentally unfair so as to deny appellant due process. *See Doyle v. Ohio,* 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976); *Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974). We hold that the prosecutorial remarks today before us did not have that effect.

Appellant relies primarily on *Doyle, supra,* in which the Supreme Court held that the use for impeachment purposes at trial of a defendant's post-arrest silence after he

---

Q. On Hancock Street?

A. I was walking south on Hancock Street, I had come from University and walking south on Hancock to here.

Q. When the officers pulled up behind you, did you take off running or anything like that?

A. I just turned around and saw them, one was over the car with a sawed off shotgun and another one coming around and had his pistol and said, you are under arrest, I just done like this.

Tr. at 146.

2. The prosecutor asked Stone, "Are you trying to tell this Jury you cooperated with the police, Mr. Stone?" Appellant answered, "Yes, sir." Tr. at 147.

3. The following colloquy occurred:

Q. You even refused—If you cooperated so much, Mr. Stone, you even refused to get in a lineup so they could identify you.

A. I did not.

Q. You did not, you did not refuse to get in a lineup, what happened?

A. They come up and told me after they set my bond in the city jail that I was going to a lineup, I said I would like to have an attorney and they brought Mr. Charley Winston up there to represent me in a lineup.

Tr. at 148.

4. In that portion of his argument, counsel stated:

Look at Mr. Stone's actions afterwards, he didn't try to flee town, he didn't try to flee town.

Now, you may be thinking he waited a little bit long. You have got to view this from his standpoint, the things that went on in his mind that night. He was scared, he was confused, he didn't know for certain that he had killed the deceased.

Now, he didn't come up here and tell you that he didn't kill the deceased, he fired, he certainly did but he didn't try to leave town. And when he was arrested, by their own officer's testimony, he was walking towards the Courthouse of Odessa, Ector County, Texas.

Tr. at 211–12.

5. The prosecutor argued in pertinent part:

Oh, he tried to cooperate with the police after he killed somebody, he sure did. . . . Don't you know if he was worried he would have come down here that night and told the police what happened. Then he wouldn't tell them anything, he wouldn't tell them anything, he had to have a lawyer. These are things you can take into consideration as far as the credibility of these witnesses.

Tr. at 233–34.

has received the *Miranda* warnings[6] violates the due process clause of the fourteenth amendment. But *Doyle* does not sustain Stone's appeal. The holding of that case was directed to the prosecutorial use of a defendant's silence to attack his exculpatory story. The impeachment inquiries there were designed to reflect on defendants' innocence.[7] However, the Court was careful to point out that the fact of post-arrest silence can be used "to challenge the defendant's testimony as to his behavior following arrest." *Id.*, 426 U.S. at 619–20 n. 11, 96 S.Ct. at 2245 n. 11. *See also United States v. Davis,* 5 Cir., 1977, 546 F.2d 617, 622 n. 4. Although that statement was addressed to a factual situation somewhat different from the one at bar,[8] the relevant distinction to be made for our purposes is between a case involving an attack on a defendant's exculpatory story and an attack on his behavior subsequent to the alleged crime for which he is being tried.

In the present case, Stone's version of the shooting was not the subject of the impeachment inquiry. Rather, the prosecutor was attempting to challenge only the proposition that Stone had been cooperative with the police. Of course, the question of Stone's cooperativeness may have affected his credibility to the jury, but it had no bearing on his claim of self-defense, which was his exculpatory story.

That the prosecutorial questioning and comment must be directed at the defendant's essential story concerning the crime for which he is charged in order to contravene the *Doyle* rule is shown ˋby *Doyle's* progeny in this circuit. In *United States v. Davis,* 5 Cir., 1977, 546 F.2d 583, for example, we spoke of "an apparent requirement that, to reverse a conviction, 'the prosecutor's comments str[ike] at the jugular of

[defendant's] story.' " *Id.* at 594, *quoting United States v. Harp,* 5 Cir., 1976, 536 F.2d 601; *cf. Chapman v. United States,* 5 Cir., 1977, 547 F.2d 1240. *Davis* was a case in which we held that prosecutorial comment upon a defendant's failure to offer his coercion defense when he was arrested for escape did not constitute reversible error in the circumstances therein. Similarly, in finding reversible error in *United States v. Impson,* 5 Cir., 1976, 531 F.2d 274, we observed that there it was "*the point upon which a defense was being constructed* [which] . . . was arguably damaged or impeached by proof of the defendant's silence when arrested." *Id.* at 276 (emphasis added). Here the issue of Stone's cooperativeness was not essential to his defense; indeed, it was unrelated to the crime charged and to Stone's story pertaining thereto. And its seed had been planted not by defendant but by the prosecutor. Therefore, the *Doyle* rule is inapplicable.

Even assuming, however, that error was committed (for we have observed above that the prosecutorial questioning amounted to overreaching), we note that the *Doyle* Court explicitly left the door open to a finding of harmlessness. *See id.,* 426 U.S. at 619–20, 96 S.Ct. at 2245. Our decisions make clear that the *Doyle* rule is not an absolute one, but requires a case-by-case application. *Davis, supra,* 546 F.2d at 594, 595 n. 31. Thus, we found that the error, if any, in *Davis* was harmless. *Accord, Chapman, supra.* Even in cases where it was held that a *Doyle* problem resulted in reversible error, there has sometimes been reference made to the fact that error therein was not harmless because the evidence was not overwhelming. *See, e. g., United States ex rel. Ross v. Fike,* 7 Cir., 1976, 534 F.2d 731, 734; *Impson, supra,* 531 F.2d at 278–79.

---

**6.** *Miranda v. Arizona,* 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966).

**7.** The prosecutor questioned the defendants in *Doyle* about their failure to tell their exculpatory story to authorities at the time of arrest. The prosecutor suggested that, if they had been innocent (and he referred specifically to their "innocence"), they would have told their story

at that time. *See Doyle, supra,* 426 U.S. at 613–15 & n. 5, 96 S.Ct. at 2242–43 & n. 5.

**8.** The Court was considering the situation of prosecutorial use of post-arrest silence to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest.

This is not such a case. We are presented here with overwhelming evidence of guilt. Stone himself admitted to shooting his gun in Cornish's direction. We note also that the disputed prosecutorial remarks were very brief in the context of the entire trial and, as indicated earlier, did not reflect on Stone's innocence or even on his exculpatory story: the comments went to the question of his cooperativeness which had nothing to do with the case against him. In other words, they "did not have an intolerably 'prejudicial impact,' *see United States v. Hale,* 422 U.S. 171, 179–80, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975), in these circumstances." *Davis, supra,* 546 F.2d at 595. The prosecutor's comments, therefore, were harmless beyond a reasonable doubt.[9]

AFFIRMED.

---

**9.** We have also considered *United States ex rel. Macon v. Yeager,* 3 Cir., 1973, 476 F.2d 613, *cert. denied,* 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104, upon which appellant relies, and in which the prosecutor made impeachment use of defendant's exercise of his right to counsel in a direct challenge to defendant's innocence. The court there found a possibility of prejudicial impact. In the instant case, however, the evidence against the defendant was far stronger, and the disputed remark was not offered to challenge directly defendant's innocence. Accordingly, *Yeager* does not affect our disposition of the case.