**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Ray McDONALD,
Defendant-Appellant.**

**No. 79–5257.**

United States Court of Appeals,
Fifth Circuit.

July 3, 1980.

Arthur Parker, Birmingham, Ala., for defendant-appellant.

Herbert H. Henry, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before COLEMAN, Chief Judge, FRANK M. JOHNSON, Jr. and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

James Ray McDonald was convicted by a jury on one count of dealing in counterfeit currency in violation of 18 U.S.C. § 473 and on one count of conspiring to deal in counterfeit currency in violation of 18 U.S.C. § 371. On appeal he claims the prosecutor transgressed his Sixth Amendment right to counsel by eliciting testimony that his lawyer was present when Secret Service agents executed a search warrant at his home and by commenting on that fact during closing arguments. We find merit in this challenge and reverse his conviction.

Count One of the indictment charged that 13 named defendants and one other person had conspired to violate three of the federal counterfeiting statutes, 18 U.S.C. §§ 471–473. Count Two charged the substantive offense. Among the defendants were McDonald, Reuben Cook "Dude" Head and Richard Dewayne Burns.

McDonald was tried in April, 1979.[1] The Secret Service agents who had investigated the case were not able to present any hard evidence against McDonald. However, there was testimony from five co-indictees, including Head and Burns, linking McDonald to the crime.

The incidents giving rise to the challenged testimony and comments occurred on December 15, 1975. Head and Burns, called as government witnesses, testified that on that day they went to McDonald's house and, assisted by McDonald, burned thousands of dollars' worth of defective bills. These bills, made by the indictees, were considered not "passable." When Head and Burns left McDonald's house, they took with them a plastic garbage bag containing the ashes and a few small unburned pieces of some of the bills. Burns threw this bag into a pile of garbage in an alley near McDonald's house as he and Head departed. Secret Service agents who had been maintaining a surveillance of the house stopped Head and Burns, arrested them and executed a search warrant for the automobile they were in. This occurred at approximately 1:30 p. m.

The agents then returned their attention to McDonald's house. Six or seven agents went into the alley to retrieve the plastic bag. One of the agents went to his office to prepare an affidavit in support of an application for a warrant to search McDonald's house. A few hours later, a federal magistrate issued the warrant, and, at around 5:30 p. m., the warrant was executed. Seven Secret Service agents searched McDonald's house for two hours but found no counterfeit money, no plates or equipment used in the manufacture of counterfeit money, no ashes and no indication that anything had been burned recently. The agents seized only some unused plastic bags similar to the bag they had found in the garbage pile in the nearby alley.

At trial McDonald sought to establish that although he had been aware that his co-indictees were engaged in a counterfeiting scheme, he was not a participant. Defense counsel explained the December 15 incident by claiming that Head and Burns had become aware that Secret Service agents were watching them and that they had gone to McDonald's house to burn the evidence against them. Counsel contended that McDonald merely had acquiesced in their efforts to cover their tracks. During closing argument defense counsel stressed that the Secret Service agents had found no evidence against McDonald during their thorough search of his house.

The prosecutor, concerned over the inferences the jury might draw from the fruitlessness of the search, offered an offsetting inference. With his questions on direct examination and his comments in rebuttal argument, the prosecutor suggested that in the four hours between the departure of Head and Burns and the execution of the search warrant, McDonald had destroyed all incriminating evidence in his house. The manner in which this was done is the cynosure of our inquiry today.

During the direct examination of Secret Service Agent Kenneth M. McCreless, who had taken part in the surveillance and in the search, the prosecutor developed the facts in support of the destruction-of-evidence theory. After McCreless described the surveillance, the arrests of Head and Burns, the retrieval of the garbage bag and the securing of the search warrant, the following exchange occurred:

Q. When you arrived to execute the warrant, who was present?

A. When I arrived, the special agent in charge of the Birmingham Secret Service, Thomas L. Jones, was there, Agent Novak, Mr. Charles Tarter, and—

Q. Who was he?

---

1. The indictment was returned in February, 1976. McDonald pleaded not guilty in March, 1976, and his trial was set for April, 1976. McDonald failed to appear for that trial. Before his 1979 trial in this case, McDonald was convicted of bail-jumping as a result of his failure to appear for the 1976 trial. That conviction was affirmed in *United States v. McDonald*, 606 F.2d 552 (5th Cir. 1979). Head and Burns were convicted in April, 1976.

A. He was an attorney representing Mr. McDonald. Mr. McDonald was there, and a lady who lived there, Brenda Evans.

The prosecutor knew what the answer would be when he interrupted McCreless to ask him to identify Tarter; he wanted the jury to know Tarter was McDonald's attorney. The predicate thus was laid for the following comments by the prosecutor in the rebuttal phase of closing argument:

Now, ladies and gentlemen, you know here is—you have seen the Secret Service agents, and here is Jimmy McDonald in his house. And here is all this commotion going on around his house, and then three hours later they arrive to serve the search warrant at 5:30 that afternoon. And who was there? *The defendant's attorney.* And that is when they went in the house to search him, three hours. I suggest to you ladies and gentlemen, I'm not going to tell you what my opinion is, but I suggest to you if Jimmy McDonald knew all this was going on, *and had his lawyer out there* three hours later, I believe that would be sufficient time to dispose of any ashes or any evidence, if you were so inclined (emphasis ours).

McDonald claims that the prosecutor used the fact that his lawyer was present during the search as a basis for an inference of guilt, impermissibly penalizing him for exercising his constitutional right to counsel. The government responds that its tactics were a fair reaction to the defense's heavy reliance on the fact that the search had produced no evidence. The government further contends that even if those tactics were in error, given the other evidence against McDonald, the error was harmless beyond a reasonable doubt.

■ The threshold inquiry concerns the effect of defense counsel's failure to object to the allegedly improper testimony and the prosecutor's closing argument. Because the alleged errors affect McDonald's substantial constitutional rights, we may notice them even though they were not brought to the trial court's attention. Fed.R.Crim.P. 52(b).

The Supreme Court has held that prosecutorial comments on an accused's failure to testify[2] or on his silence at the time of his arrest[3] infringe upon his Fifth Amendment right against compulsory self-incrimination. The Supreme Court has not yet addressed the effect of prosecutorial comments on an accused's exercise of his right to counsel. Several circuit courts have.

■ In *United States ex rel. Macon v. Yeager*, 476 F.2d 613 (3rd Cir. 1973), the court reversed a murder conviction because the prosecutor had claimed in his closing argument that the defendant's actions immediately after the commission of the crime, including his hiring of an attorney, were inconsistent with his claim of innocence. The *Macon* court further held that the evidence in the case was such that the error could not be considered harmless. In *United States v. Liddy*, 509 F.2d 428 (D.C. Cir.1974), and *United States v. Williams*, 556 F.2d 65 (D.C.Cir.1977), the court found error in references to the defendants' exercise of their right to counsel but held that the errors were harmless. In *Zemina v. Solem*, 573 F.2d 1027 (8th Cir. 1978), the court, without discussing the issue of harmless error, reversed a manslaughter conviction because the prosecutor had suggested that the defendant's post-arrest telephone call to his lawyer indicated his guilt.

We previously have had occasion to consider this question. In *Stone v. Estelle*, 556 F.2d 1242 (5th Cir. 1977), we affirmed the district court's refusal to grant a writ of habeas corpus to a defendant who claimed that the prosecutor at his murder trial had commented impermissibly on his exercise of his right to counsel. Stone admitted killing the victim but claimed self-defense. He testified that at the time of his arrest he was on his way to turn himself in, and he claimed that he had cooperated fully with the police. In order to refute the latter claim, the prosecutor asked the defendant

---

**2.** *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

**3.** *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

about his refusal to participate in a lineup. Although the defendant denied that he had so refused, he did say he had asked for a lawyer. During closing arguments, the prosecutor said:

> Oh, he tried to cooperate with the police after he killed somebody, he sure did. . . . Don't you know if he was worried he would have come down here that night and told the police what happened. Then he wouldn't tell them anything, he wouldn't tell them anything, he had to have a lawyer. These are things you can take into consideration as far as the credibility of these witnesses.

556 F.2d at 1244 n. 5. On appeal Stone relied on *Doyle, supra.* In *Doyle* the prosecutor had commented on the defendant's failure to tell his exculpatory story to the police at the time of his arrest. The Supreme Court held that this infringed the defendant's Fifth Amendment right to remain silent. We found the prosecutor's comment in *Stone* to be "unwarranted," but because the remarks had not "produced a trial which was fundamentally unfair so as to deny appellant due process," affirmed the denial of the application for writ of habeas corpus. We distinguished *Doyle* on the grounds that the comment in *Doyle* was used as a direct attack on the defendant's exculpatory story while the comment in *Stone* was in support of the government's theory on a merely collateral issue. We said in *Stone* :

> In the present case, Stone's version of the shooting was not the subject of the impeachment inquiry. Rather, the prosecutor was attempting to challenge only the proposition that Stone had been cooperative with the police. Of course, the question of Stone's cooperativeness may have affected his credibility to the jury, but it had no bearing on his claim of self-defense, which was his exculpatory story.
>
> That the prosecutorial questioning and comment must be directed at the defendant's essential story concerning the crime for which he is charged in order to contravene the *Doyle* rule is shown by *Doyle's* progeny in this circuit. In *United*

*States v. Davis,* 5 Cir., 1977, 546 F.2d 583, for example, we spoke of "an apparent requirement that, to reverse a conviction, 'the prosecutor's comments str[ike] at the jugular of [defendant's] story.' " *Id.* at 594, quoting *United States v. Harp,* 5 Cir., 1976, 536 F.2d 601; *cf. Chapman v. United States,* 5 Cir., 1977, 547 F.2d 1240. *Davis* was a case in which we held that prosecutorial comment upon a defendant's failure to offer his coercion defense when he was arrested for escape did not constitute reversible error in the circumstances therein. . . . Here the issue of Stone's cooperativeness was not essential to his defense; indeed, it was unrelated to the crime charged and to Stone's story pertaining thereto.

556 F.2d at 1245.

The use made of the references to McDonald's lawyer makes this case more akin to *Doyle* than it is to *Stone.* The implication that McDonald had destroyed incriminating evidence struck at the jugular of his exculpatory story, the essence of which was that there was no evidence to destroy.

Our decision today fully extends the *Davis* distinction to cases involving comments on a defendant's exercise of his right to counsel. The dividing line of *Davis* separates comments that "strike at the jugular" of a defendant's story and those dealing only tangentially with it.

The government argues that it used the references to the lawyer's presence not to impute guilt but rather to establish that when he summoned his lawyer McDonald knew that Secret Service agents were watching his house. Thus, the government argues, McDonald had the time and incentive to destroy the evidence. We cannot accept this argument.

The record contains ample evidence from which the jury could have found this motivation and opportunity. Almost four hours elapsed between the time that Secret Service agents arrested Head and Burns and picked up the plastic bag near McDonald's house and the time the search warrant was executed. The agents were "beating the

bushes" and there was a "commotion" around McDonald's house while the agents, whose presence was open, awaited the arrival of the search warrant. The facts that the government contends it was trying to prove had been proven without reference to the presence of McDonald's lawyer. We conclude that the real purpose of the reference to the attorney's presence was to cause the jury to infer that McDonald was guilty. The reference therefore penalized McDonald for exercising his Sixth Amendment right to counsel.

We were impressed with the candor of the prosecutor during oral argument and with the sincerity of his statements that he intended no reflection on Tarter and that he did not intend to suggest that Tarter acted or would have acted illegally or unethically. Unfortunately, it is difficult, if not impossible, to sanitize the comments so as to remove the taint. Inherent in the comments is the barb that the lawyer caused, aided in or, at the very least, tolerated the destruction of evidence. The comments affected the fairness of McDonald's trial.

■ The comments were likely to give rise, in the average juror's mind, to at least three inferences: (1) McDonald's attorney acted illegally or unethically, (2) defense counsel generally in criminal cases act illegally or unethically, and (3) McDonald would not have gotten a lawyer unless he was guilty. The prosecutor has convinced us he did not intend the first inference. Had he intended it, he would have been obliged to report the unethical or illegal conduct.[4] No prosecutor, however, may impugn the integrity of a particular lawyer or that of lawyers in general, without basis in fact, as a means of imputing guilt to a defendant. It is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel.

■ We turn now to the government's contention that, given the quantity of evidence against McDonald, any infringement of his right to counsel was harmless error. Violations of some constitutional rights may be considered harmless errors. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman*, 386 U.S. at 23, 87 S.Ct. at 827. We held in *United States v. Hammond*, 598 F.2d 1008 (5th Cir. 1979), that the denial through governmental misconduct of a defendant's right to present witnesses to establish a defense may never be considered harmless error. We consider the error in this case to be harmful per se.

■ Comments that penalize a defendant for the exercise of his right to counsel and that also strike at the core of his defense cannot be considered harmless error. The right to counsel is so basic to all other rights that it must be accorded very careful treatment. Obvious and insidious attacks on the exercise of this constitutional right are antithetical to the concept of a fair trial and are reversible error.

---

4. The Code of Professional Responsibility prepared and recommended by the American Bar Association, adopted with little change in most states, requires that any attorney possessing unprivileged knowledge of unethical conduct must report the information to the proper authorities. Disciplinary Rule 1–103 provides in pertinent part:

    (A) A lawyer possessing unprivileged knowledge of a violation of DR 1–102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.

Disciplinary Rule 1–102 provides in pertinent part:

    (A) A lawyer shall not:
      (1) Violate a Disciplinary Rule.
      (2) Circumvent a Disciplinary Rule through actions of another.
      (3) Engage in illegal conduct involving moral turpitude.
      (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
      (5) Engage in conduct that is prejudicial to the administration of justice.
      (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

Although the foregoing disposes of this appeal, we briefly address the three other issues McDonald raises.

At trial, McDonald attacked the credibility of the co-indictees who were called as government witnesses. He complains that part of the jury instruction concerning credibility was confusing. The court charged:

> Now should you believe that any witness has willfully sworn falsely to a material fact in the case, you may disregard his testimony in whole or in part, except insofar as it may have been corroborated by other credible evidence.

We agree with McDonald's argument that the portion of the charge following the word "part" may have led the jury to believe that, if it found any support for the testimony of a perjurious witness, it was compelled to believe that testimony. The government notes that this instruction is contained in the *Manual on Jury Instructions in Federal Criminal Cases*, 33 F.R.D. 523, 574 (1963), adopted in 1963 by the Seventh Circuit Judicial Conference Committee on Jury Instructions. The analogous instruction, 7A of the Pattern Jury Instructions (Criminal Cases), prepared in 1978 by the Committee on Pattern Jury Instructions, District Judges Association, Fifth Circuit, reads in pertinent part:

> A witness may be discredited or "impeached" by . . . a showing that he testified falsely concerning a material matter . . .
>
> If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

We approve this instruction. It avoids the possibility of confusion that the "corroboration" language occasions.

McDonald also complains of prejudice arising from the district court's reference to a presentence report containing "a lot of information that would be improper for a jury to see." The court charged:

> Now, ladies and gentlemen, you are here to determine in the light of these instructions on the law a simple question on each of the two counts. Is the defendant guilty or not guilty? You will not be asked to decide upon his punishment. That is a question entirely for the Court, and it's not your concern in federal court ever. Juries don't determine punishment in federal court. In fact, you're to put that out of your mind. You are not to consider the fact that the defendant might be punished or how much. The Court has a very wide latitude, depending on the investigation of the confidential nature that the Court hasn't seen yet, because the defendant hasn't been convicted. If he's not convicted, the Court won't look at it. If he is convicted, the Court will then look at it, and the Court will make a decision based upon, in part, the pre-sentence report, which has been made from a wide variety of sources and contains a lot of information that would be improper for a jury to see. So you put questions of punishment out of your mind. That's my problem.

We find this charge inappropriate. We approve the following portion of Instruction 10A of the Pattern Jury Instructions, *supra*:

> Also, the punishment provided by law for the offense charged in the indictment is a matter exclusively within the province of the court or judge, and should never be considered by the jury in any way, in arriving at an impartial verdict as to the guilt or innocence of the accused.

We find the instructions as given improper. However, we express no opinion on whether they would constitute reversible error when examined in the context of the total jury charge. Our disposition of this appeal makes consideration of that question unnecessary.

McDonald's final contention is that the district court incorrectly restricted his right to cross-examine Head. He claims that in sustaining the prosecutor's objection to a question about Head's motive for testifying, the district court infringed his Sixth

Amendment right to confront witnesses.[5] We find that the district court acted within its discretion in sustaining the objection. However, even were we to determine that the question should have been allowed, the error, given the weight of evidence against McDonald and the number of other prosecution witnesses testifying to substantially the same facts as did Head, would have to be considered harmless. *See United States v. Elliott,* 571 F.2d 880 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Brunson,* 549 F.2d 348 (5th Cir.), *cert. denied,* 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1977).

The conviction is REVERSED.

5. As mentioned above, Head was convicted in 1976 for participation in the counterfeiting scheme. McDonald's trial was held four and a half months prior to the time Head was to have been released on parole. These facts were established during direct examination of Head. On cross-examination, Head testified that the government had made no promises in exchange for his testimony against McDonald. Defense counsel then asked Head whether he had "any judgment as to what may happen to your parole in the event that you didn't testify and cooperate with the government in this case." The district court sustained the prosecutor's objection to this question.