Filed 12/24/20  P. v. Miller CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>SUSAN MILLER,<br><br>　　　　Defendant and Appellant. | A158166<br><br>Mendocino County<br>Super. Ct. No. SCUK-CRCR-2018-93826) |

Defendant Susan Miller appeals a judgment convicting her of being an accessory to her husband's alleged attempted murder of their neighbors. It was undisputed that defendant's husband shot at the neighbors without legal provocation during a verbal dispute. The evidence and argument centered on whether defendant had the requisite knowledge of her husband's actions and acted with the intent to help him avoid arrest.

On appeal, defendant contends the court erred by limiting the admission of evidence of a prior altercation between defendant's husband and the shooting victim, by failing to instruct on the defense of mistake-of-fact, and by failing to instruct on the lesser offenses of destroying evidence and making false statements to the police. Defendant also asserts a claim of ineffective assistance of counsel based on her attorney's failure to object to the introduction of testimony regarding her decision to consult with an attorney before consenting to a search of her car and to the prosecutor's

1

argument in closing that her decision reflected a consciousness of guilt. Finally, she argues that the cumulative impact of the multiple errors warrants reversal. We find no prejudicial error and therefore shall affirm the judgment.

## Background

Defendant's husband Harry was charged with the attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)) of his neighbor Paul P. and Paul's wife Desiree P. and defendant was charged with one count of being an accessory to those crimes (§ 32).[2] After the proceedings against Harry were suspended pursuant to section 1368 due to his lack of competency, the charge against defendant alone proceeded to trial.

Evidence was introduced that the home of defendant and Harry shared a driveway with the home of Paul and Desiree. In the afternoon of March 26, 2018, Harry shot Paul in the driveway. According to Desiree, she and Paul were spreading gravel to fill potholes in the driveway when Harry, standing in the middle of the pile of gravel, told them to get off his property. When she told Harry they had the right to maintain the shared driveway, he took a gun out of his pocket and shot Paul in the stomach. As Harry continued to fire his gun four more times, she and Paul ran to take cover behind their truck. When Harry followed them, she charged Harry and wrapped him in a bear hug to prevent him from using his arms. The two continued to wrestle until

---

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] California Rules of Court, rule 8.90(b) requires appellate courts to "consider referring to" victims in criminal proceedings "by first name and last initial" to protect those individuals' privacy. Accordingly, we refer to the victims in this case by their first names and last initials, and thereafter by first names only. We refer to defendant's husband by his first name to avoid any confusion as he shares the same last name as defendant. Our use of first names is not intended as a sign of disrespect.

2

the gun dropped to the ground. As both of them scrambled to retrieve it, Paul hit Harry on the leg and head with a shovel. Desiree picked up the gun, then she and Paul got into the truck and drove to the hospital. On the way to the hospital, Desiree reported the shooting to the police.

When the police arrived at the scene of the shooting, an officer spoke to defendant, who told the officer that Paul was the initial aggressor. Defendant explained to the officer that she and her husband had an ongoing dispute with the neighbors over their use of gravel on their shared driveway. That afternoon, when Paul started shoveling the gravel, Harry went outside to talk to Paul. Harry was standing on the gravel pile when Paul hit Harry on his left leg with the shovel, causing Harry to fall. As he fell, Harry pulled out a gun and shot Paul. She indicated that she thought there was more than one shot. She also thought her husband was hit in the head with the shovel after he fired the first shot. She described her husband as "unconscious, out cold" after being hit in the head with the shovel.[3] After speaking to the police, defendant took Harry to the hospital for treatment of his injuries. She did not reveal to the officer that she had filmed the incident.

Later that evening, when the police interviewed Desiree, they learned that defendant had video-recorded the incident on a digital camera. An officer testified that he went to the hospital the following day to speak to defendant about the camera. He advised her that he had a video that showed her "holding a camera while her husband shot another man." The officer

---

[3] Defendant's statement to the police was recorded in the police report as follows: "My husband starting going down and he pulled his gun out of his pocket and he shot him. Then [Paul] came back and hit him on the back of the head on the side right here with the shovel. And then he hit him right here in the forehead with a shovel. I don't know how many times because I was -- at that point I was just watching him beat my husband with a shovel."

3

explained that he could get a search warrant to look for the camera or she could consent to the search and give him the camera. Defendant indicated that she did not want to talk to the officer and would like to speak to an attorney. While defendant spoke to her attorney, the officer obtained a warrant authorizing the search of her car for the camera. After consulting with her attorney, she consented to the search.

On the camera recovered from defendant's car, officers found four photos of Harry laying injured on the ground and four videos. Later, officers were able to recover an additional video that had been deleted but remained on the memory card. The deleted video was taken before the four photos of Harry on the ground. The deleted video was played for the jury along with video taken by Paul and video recovered from Paul's security camera. Combined, the videos showed that Harry, not Paul, was the initial aggressor. The videos show Paul and Desiree shoveling the gravel and Harry standing on the pile. After Paul shows Harry that he's recording the interaction on his cell phone, Harry says "am I supposed to read that" and almost immediately pulls a gun from his pocket and shoots Paul. Paul's surveillance camera shows that after Harry fired his gun he chased after Paul.

At trial, defendant testified at length about her ongoing dispute with the neighbors over their shared use of the driveway. She and Harry had filed a civil complaint against the neighbors for their repeated encroachment on their property, but the issues were not yet resolved. In January 2017, an argument between Paul and Harry turned violent when Paul pushed Harry to the ground causing him to be bed ridden for six weeks with a broken back. After that incident, defendant and her husband unsuccessfully tried to get help from the district attorney's office and the sheriff about Paul's continued

4

threatening behavior. She testified that Paul repeatedly drove too fast on the driveway and she was afraid he would run her over.

Defendant testified that at the time of the shooting she was not looking directly at Harry and Paul. She was watching the scene unfold through the screen on her digital camera. She claimed that she heard the gunshot but did not see what had happened. The sun was reflecting on the screen of her camera so she "couldn't really see very well into the camera." She didn't know "if it was a firecracker or an explosion or what." After the shot, she moved the camera down and looked towards Harry but what she saw did not "make sense" to her. She claimed that she was in shock and distracted when she spoke to the police officer after the incident. She told the officer what she thought had happened based what she inferred from Harry's injuries because she had not seen a lot of what had actually happened. She confirmed that she did not see Paul hit Harry on his leg. She explained, "I was trying to make sense of an unreal, crazy situation. I was trying to just search in my mind to find some way of explaining it to somebody else when I really didn't even understand it myself." She agreed that there were some things that she thought she knew but that in reality she "hadn't actually seen . . . them."

She also explained that she deleted the video while at the hospital. She had started to watch it but stopped watching before the shooting because it was too upsetting to hear Paul's voice. She deleted the video to stop it from playing. She was worried at first that she had deleted evidence that would help them in their civil suit, but then remembered that the file could still be recovered if she did not continue to use the camera so she turned it off.

In closing argument, defense counsel argued that defendant was not guilty because at the time she spoke to the police and deleted the video she mistakenly believed Harry had acted in self-defense and did not know he had

committed a felony, as required to prove a violation of section 32. Counsel explained, "the short of it, she had a poor perception of the incident and did her best to tell the officer what she believed happened, and in doing that, she drew inferences from the facts that she did have. Why does she tell [the officer] . . . that [Paul] had struck her husband in the leg with a shovel? And then her husband only shot himself in self-defense? Why does she do that? She does that because she knew certain things. She knew that Paul was standing by her husband's left leg and shoveling. She saw that. She knew that . . . he had been hit in the left leg because she saw the leg injuries, and she saw the damage to the pants, again the left leg. Right by where the shovel was. So she had those. So she also knew [Paul] is a dangerous man who had pushed her husband down in 2017 and broken his back. . . . [¶] . . . [¶] So she put all of those things together and concluded though she didn't see it, she concluded just like she made conclusions about what was in [Paul's] mind, she concluded that [Paul] must have hit her husband in the leg with the shovel causing the damage to pants and the leg causing Harry to shoot in self-defense."

The jury found defendant guilty as charged. The court placed her on probation for 36 months with the condition that she serve 300 days in jail. Defendant timely filed a notice of appeal.

## Discussion

Defendant was convicted of being an accessory under section 32, which provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." The jury

6

was instructed that to find defendant guilty it had to find that she "knew that the perpetrator had committed a felony," that after the felony had been committed, she "aided the perpetrator," and that when she acted she "intended that the perpetrator avoid or escape arrest . . . ." (CALCRIM No. 440.)

On appeal, defendant does not dispute that Harry committed a felony. She does not challenge the overwhelming evidence that "Harry shot Paul without legal provocation during a verbal dispute." She also does not dispute that her statement to the police that Paul was the initial aggressor was false and that shortly after the incident she deleted the video which demonstrated the falsity of her statement. She argues, however, that the court's evidentiary and instructional errors and her attorney's ineffective assistance precluded the jury from fully considering her defense, which was that "she was not guilty as an accessory under section 32 because at the time she allegedly committed that crime she *mistakenly believed* Harry had acted in self-defense and thus she did *not* know he had committed a felony as required to prove guilt under that statute."

### 1. The January 2017 Incident

As set forth above, defendant testified that in January 2017, Harry suffered a significant back injury when Paul pushed Harry to the ground during an argument. She testified that after the incident, the police responded to her call. Finally, she testified that in the month preceding the shooting she wrote letters and emails to various law enforcement officials including the county sheriff, warning that Paul is an angry bully, that they were living in fear, and that if law enforcement does not help them, she believed Paul would kill them. On appeal, she contends the court erred in excluding evidence that Paul had been charged with assault with great bodily

7

injury following the January 2017 incident and that Paul pled guilty to misdemeanor disturbing the peace in exchange for probation and a protective order allowing him to have only peaceful contact with her and Harry. She also argues that the court erred in excluding from evidence the letter defendant wrote to the sheriff.

It is unclear that defendant attempted to introduce this evidence at trial. Prior to trial, defense counsel indicated that he intended to call as witnesses an investigator from the district attorney's office and a deputy district attorney to testify about the January 2017 incident and defendant's subsequent emails to law enforcement. While the prosecutor argued that most of this testimony would be inadmissible hearsay, defense counsel countered that defendant's statements to the witnesses regarding her fear of Paul would be admissible as prior consistent statements and would be relevant to "her mental state and why she would *misperceive what she saw*" at the time of the shooting. (Italics added.) The court did not rule on the admissibility of these witnesses' testimony and ultimately the witnesses were not called. Prior to the start of trial, the court ruled that Paul's misdemeanor conviction for disturbing the peace was inadmissible and that there should be no mention of Paul's probation because "asking her about probation would be a back door way of bringing in a non-moral turpitude misdemeanor." Defense counsel did not challenge the court's ruling on the admissibility of the conviction and agreed that he would not "need to talk to [defendant] about the probation." Defense counsel indicated that he intended to ask defendant "about some of the things that happened" between the two couples and the court agreed that the fact that there is "bad blood" between the couples "is certainly going to come in a number of different ways." Consistent with its ruling, the court allowed defendant to testify as described above but

8

prohibited defense counsel from introducing a copy of defendant's letter to the sheriff which apparently referenced the restraining order issued as a condition of Paul's probation. Defendant argues that the court's ruling necessarily excluded the evidence that Paul was initially charged with a felony assault and precluded him from calling the law enforcement witnesses to testify about her prior statements concerning Paul. Alternatively, she argues her attorney rendered ineffective assistance by failing to introduce this evidence.

We need not address the admissibility of the evidence because the failure to introduce it was harmless. While defense counsel may have been correct in arguing prior to trial that this evidence might be relevant to explain "why she would *misperceive what she saw*" (italics added), defendant did not testify that she misperceived or misunderstood what she saw. She testified repeatedly that she did not see what happened immediately preceding the first shot. She also testified that she had not watched the video at the time she deleted it. Defendant's state of mind with respect to Paul is irrelevant to whether she saw the incident or watched the video. If the jury believed defendant when she testified that she had not seen the shooting and had not watched the video, it would have been required to find her not guilty based on her lack of knowledge regarding Harry's crime. Because the jury found defendant guilty, the jury necessarily found either that she had seen the shooting or that she watched the video before deleting it. Once the jury so determined, the only reasonable conclusion is that she acted with the intent to help her husband avoid arrest. Defendant does not suggest otherwise. Accordingly, any potential error regarding the exclusion of this evidence is harmless.

## 2. Mistake of Fact

Defendant contends the court erred by failing to instruct the jury that a mistake of fact is a defense to the charged crime. She argues that the jury was entitled to find her not guilty if it found that she had an honest but unreasonable belief that Harry acted in self-defense. We disagree.

As detailed above, defendant's testimony was not that she misunderstood what she saw (i.e., that she honestly but unreasonably thought she saw Harry shoot Paul in self-defense). Her defense was that she had not actually seen the shooting and told the officer what she assumed must have happened. Accordingly, no evidence was presented to support giving the mistake-of-fact instruction.

## 3. Lesser Offenses

Defendant contends the trial court erred in failing to instruct sua sponte on destroying evidence (§ 135) and making false statements to law enforcement (§ 148) as lesser included offenses to the charged offense.[4]

A trial court must instruct the jury sua sponte on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant committed the lesser offense but not the greater. (*People v.*

---

[4] Section 135 provides: "A person who, knowing that any book, paper, record, instrument in writing, digital image, video recording owned by another, or other matter or thing, is about to be produced in evidence upon a trial, inquiry, or investigation, authorized by law, willfully destroys, erases, or conceals the same, with the intent to prevent it or its content from being produced, is guilty of a misdemeanor."

Section 148, subdivision (a)(1) provides: "Every person who willfully . . . obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

*Macias* (2018) 26 Cal.App.5th 957, 961 (*Macias*).) " '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*People v. Licas* (2007) 41 Cal.4th 362, 366.) Defendant concedes that these lesser offenses are not necessarily included in the charged offense under the elements test or the accusatory pleading test. She argues, however, that the court should use the "expanded accusatory pleading test" employed in *People v. Ortega* (2015) 240 Cal.App.4th 956, 967 (*Ortega*), which would permit consideration of the evidence at the preliminary hearing to find the proposed crimes to be lesser included offenses.

We question the viability of this "expanded" test. Published cases since *Ortega* have uniformly declined to follow it and instead apply the accusatory pleading test without regard to evidence from the preliminary hearing. (See, e.g., *People v. Alvarez* (2019) 32 Cal.App.5th 781, 787-790; *People v. Munoz* (2019) 31 Cal.App.5th 143, 157-158; *Macias, supra*, 26 Cal.App.5th at pp. 963-965.) These cases reason that *Ortega* is inconsistent with the Supreme Court's decision in *People v. Montoya* (2004) 33 Cal.4th 1031, which requires courts to "consider only the [accusatory] pleading" in determining whether a charged offense includes a lesser included offense under the accusatory pleading test. (*Id*. at p. 1036, italics omitted; see, e.g., *Munoz, supra*, at p. 156 ["The Supreme Court has indicated repeatedly . . . that when applying the accusatory pleading test to determine whether one offense is necessarily included in another, courts do not look to evidence beyond the actual pleading and its allegations regarding the purported greater offense." We need not

11

resolve this issue, however, because the failure to instruct on the lesser offenses is harmless.

Here, there is no likelihood the jury would have convicted defendant of the lesser offenses but not the charged offense. To convict defendant of either of these offenses but not the charged offense, the jury would have had to credit defendant's testimony that she had not seen the shooting and thus did not know that Harry had committed a felony, but nonetheless made an intentionally false statement to the police or intentionally destroyed evidence by deleting the video. No evidence was presented to support such a theory.

### 4. Ineffective Assistance of Counsel

In order to prevail on a claim of ineffective assistance of counsel, defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694; *People v. Ledesma* (1987) 43 Cal.3d 171, 214-218.)

Defendant contends her counsel's performance was deficient in three specific respects. Initially, she faults her attorney for failing to call an expert witness on eyewitness fallibility. As defendant notes, the record shows that counsel intended to call such an expert but ultimately did not. When the matter was raised before defendant's testimony, the court deferred ruling on the admissibility of the expert's testimony noting, "You are really talking about the mental processes of a particular individual and that would be Ms. Miller. She has not testified yet. So I, you know, within reason don't know what she's exactly going to say. Nor would this witness." Defense counsel rested his case after defendant's testimony without calling the expert. For the

reasons discussed above, the expert's testimony had no relevance to what defendant knew when she told the officer that Paul had initiated the violence. She did not misperceive that particular event. Rather she claimed to have not seen it at all. Accordingly, defendant was not prejudiced by any purported failure to call the expert witness.

Next, defendant faults counsel for failing to introduce Harry's medical records from the January 2017 incident to corroborate her testimony regarding his broken back. Again, the record shows that counsel was prepared to introduce this evidence, but did not do so.[5] Defendant argues the absence of this evidence was relevant because it allowed the prosecutor to question her credibility. She notes that in closing argument, the prosecutor questioned the severity of Harry's injury after the assault. The prosecutor argued, "Where is the evidence that there was a broken back? . . . Where is that evidence? If it really happened, Paul . . . really broke his back [versus] something else, okay, where was that evidence?" The prosecutor did not, however, dispute that the incident occurred, only the extent of Harry's injury. Given that this attack on defendant's credibility was limited and not directly related to the critical question of whether she saw the shooting, any potential error was harmless.

Finally, defendant argues her attorney should have objected to the prosecutor's questions to the police officer regarding defendant's consultation with her attorney before she consented to his search of her car for the

---

[5] Prior to trial, counsel argued the records were admissible to show "how [defendant] sees the incident between her husband and [Paul], how she sees her husband as the victim, the person that's fragile and delicate, the person that's been attacked before by [Paul], the person that she sees being attacked again by [Paul]." As discussed above, evidence explaining why or how she misperceived what happened during the shooting had no relevance after she testified she had not actually seen the shooting.

13

camera. She argues that the prosecutor's introduction of this evidence penalized her "for considering her 4th Amendment rights and exercising her 5th and 6th and 14th Amendment rights to consult counsel." She argues that the failure to object was prejudicial because it allowed the prosecutor to argue in closing that if defendant believed Harry had done nothing wrong, she would not have responded to the officer's request for the camera by asking to speak to an attorney. Specifically, the prosecutor argued: "[S]he wants to talk to an attorney so she calls a criminal defense attorney. They want to say . . . they decide to call a personal injury attorney is what they want you to believe for the January 17th, 2017, incident. But we now know that the attorney she called is her husband's criminal defense attorney. So she's okay after speaking with the criminal defense attorney, which by the way, [if] you are a victim, why would you call a criminal defense attorney? Why would you do that? She decides to give conditional consent. So what's that mean? Well, that allows for that argument later on, I was under duress. This person was being very mean to me. I only gave this consent because they threatened me with a search warrant, and then that allows Fourth Amendment search and seizure litigation, and then maybe that [camera] gets thrown out."

The Attorney General argues that it is "unclear" whether the prosecutor's admission and use of this evidence of was permissible. We disagree. The Attorney General has not cited, nor have we found, any case in which the use of defendant's pre-arrest consultation with an attorney was held to be admissible for the sole purpose of establishing defendant's guilt. To the contrary, courts have consistently held that it is improper to infer guilt from defendant's consultation with an attorney. (See *Bruno v. Rushen* (9th Cir. 1983) 721 F.2d 1193, 1194 ["in no situation in a criminal trial . . . do we

14

feel the mere act of hiring an attorney is probative in the least of the guilt or innocence of defendants"]; *United States v. McDonald* (5th Cir. 1980) 620 F.2d 559, 564 ["It is impermissible to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel."].)

In *United States ex rel. Macon v. Yeager* (3d Cir. 1973) 476 F.2d 613 (*Macon*), the court held that the prosecutor's use of a defendant's pre-arrest, pre-*Miranda*[6] consultation with an attorney to infer guilt violated the defendant's right to counsel. In that case, the prosecutor asked in closing argument whether defendant's consultation with an attorney after he shot the victim was an "act of innocence?" (*Id.* at p. 614.) The court reasoned that insofar as the prosecutor sought to raise in the minds of the jurors an inference of guilt, the introduction of the evidence and the prosecutor's argument penalized defendant for the exercising his constitutional right to counsel. (*Id.* at p. 615.) More recently, in *Marshall v. Hendricks* (3d Cir. 2002) 307 F.3d 36, 76, the Third Circuit relied on its decision in *Macon* to find improper a prosecutor's argument that if defendant were innocent, he would not have "run out and hire[d] an attorney." (See also *United States v. McDonald, supra,* 620 F.2d at p. 564 [attorney's presence during search of defendant's home was not admissible to infer guilt].)[7]

---

[6] *Miranda v. Arizona* (1966) 384 U.S. 436.

[7] The Attorney General's citation to cases involving pre-*Miranda* silence to question the constitutionality of the use of defendant's request for counsel in this case is not persuasive. As noted by the Attorney General, the constitutionality of use of pre-*Miranda* silence to prove guilt is unclear. (Compare *United States v. Oplinger* (9th Cir. 1998) 150 F.3d 1061, overruled on a different ground in *United States v. Contreras* (9th Cir. 2010) 593 F.3d 1135, 1136 [comment on defendant's pre-arrest, pre-*Miranda* silence does not violate the Fifth Amendment's privilege against self-incrimination]; *United States v. Zanabria* (5th Cir. 1996) 74 F.3d 590, 593 [same]; *United States v.*

15

Contrary to the Attorney General's argument, defense counsel's failure to object cannot be understood as a reasonable tactical decision. (*People v. Jackson* (1989) 49 Cal.3d 1170, 1188 ["When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation], the contention must be rejected."]; *People v. Kelly* (1992) 1 Cal.4th 495, 520 ["A reviewing court will not second-guess trial counsel's reasonable tactical decisions."].) There is no conceivable downside to objecting in this

*Rivera* (11th Cir. 1991) 944 F.2d 1563, 1568 [same] with *Combs v. Coyle* (6th Cir. 2000) 205 F.3d 269, 283 [rejecting above cases and agreeing with the reasoning expressed in the opinions of the Seventh, First, and Tenth Circuits that the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination]; see also *People v. Tom* (2014) 59 Cal.4th 1210, 1225 [acknowledging split in federal authority but holding that "[e]ven assuming the privilege against self-incrimination protects against evidentiary use of postarrest silence in this context, . . . that the privilege 'is not self-executing' and 'may not be relied upon unless it is invoked in a timely fashion' "]; *People v. Waldie* (2009) 173 Cal.App.4th 358, 365-366 [indicating its inclination to accept defendant's arguments that pre-arrest silence is protected by privilege against self-incrimination but finding any error harmless].) As explained in *People v. Tom*, however, even assuming the constitution did not prohibit the admission and use of defendant's consultation with her attorney in this case, the evidence remains subject to objection under Evidence Code section 352. (See *People v. Tom, supra*, 59 Cal.4th at p. 1236 ["Our conclusion that use of a defendant's postarrest, pre-*Miranda* silence is not barred by the Fifth Amendment in the absence of custodial interrogation or a clear invocation of the privilege does not mean that evidence overcoming those constitutional hurdles would necessarily be admissible under the Evidence Code."].) Evidence that a defendant consulted with an attorney is not at all probative of the defendant's guilt but is highly prejudicial.

case. Accordingly, counsel's failure to object was deficient. It was, however, as discussed below not prejudicial.

Defendant's credibility was so thoroughly impeached by other evidence that there is no reasonable likelihood that she would have been acquitted had this evidence been excluded. Throughout defendant's cross-examination, each time she was asked about a discrepancy in her testimony and what was shown on a video recording, defendant claimed that she had not watched the video because it was too upsetting. When asked if she watched when the video was shown in the courtroom, she responded, "I was here in the courtroom. I was not attentive." As discussed above, defendant claimed she could not see what led up to the shooting because she was watching through her camera screen and that after the first shot, she remembered only parts of what happened. On cross-examination, she acknowledged, however, that in her statement to the police she claimed to have been "watching" Paul beat her husband with a shovel. Video taken from Paul's phone and Paul's security camera show that defendant was recording the video from less than a car's length away. Photographs show her with the camera down staring directly at Harry and Paul just after the shooting occurred and Harry is still standing and continuing to shoot. On cross-examination she claimed that she was only looking at Paul and not Harry despite the fact that Harry was standing between her and Paul. It is simply inconceivable, given the video evidence, that defendant did not see the shooting and believed that her husband had been knocked to the ground before he fired his gun.

Similarly, defendant testified in great detail that she deleted the video from the camera in the hospital after hearing Paul's voice. She explained, "I opened [the video]. And it started and I heard [Paul's] voice, he has the Brooklyn accent, it's very strong, it is very distinct. I knew it was him. And I

wanted to stop it." Paul, however, does not speak on that video. When the video was played for defendant on cross-examination and she was asked to identify the voice that made her turn the video off, she claimed, "That's it. I started hearing that wind and that noise and that's it. I don't know who is talking, but that's it." In conclusion, given defendant's overall lack of credibility, counsel's failure to object to the evidence regarding her consultation with an attorney was not prejudicial.

## Disposition

The judgment is affirmed.

POLLAK, P. J.

WE CONCUR:

TUCHER, J.
BROWN, J.