575 So.2d 1165 (1990)
Thomas Douglas ARTHUR
v.
STATE.
6 Div. 477.
Court of Criminal Appeals of Alabama.
May 25, 1990.
Rehearing Denied October 26, 1990.
*1167 William R. Hovater, Tuscumbia, and H. Alan Gargis, Muscle Shoals, for appellant.
Don Siegelman, Atty. Gen., and William D. Little and Andy S. Poole, Asst. Attys. Gen., for appellee.
PATTERSON, Judge.
The appellant, Thomas Douglas Arthur, was indicted by a Colbert County grand jury for the capital offense of "[m]urder by a defendant who has been convicted of any other murder in the 20 years preceding the crime," § 13A-5-40(a)(13), Code of Alabama 1975. His first trial, occurring in February 1982, resulted in a guilty verdict and a sentence of death, as recommended by the jury. This conviction and sentence were affirmed by this court. Arthur v. State, 472 So.2d 650 (Ala.Cr.App.1984). However, our supreme court reversed, ruling that details of Arthur's prior second-degree murder conviction were not admissible under the identity exception to the general exclusionary rule that evidence of the defendant's wrongdoing, which itself is a crime, is not admissible if its only probative value is to show his bad character, inclination, or propensity to commit the type of crime for which he is being tried. Ex parte Arthur, 472 So.2d 665 (Ala.1985).
After a change of venue to the Jefferson County Circuit Court, Arthur's second trial, which proceeded under the 1982 indictment,[1] began on May 5, 1987, and, on May 13, the jury returned a verdict of guilty as charged. After a sentencing hearing, the jury, by a vote of 10 to 2, recommended that Arthur be sentenced to death. On May 29, the trial court held a sentencing hearing wherein it set Arthur's punishment at death.
Arthur's motion for new trial was denied by written order on April 12, 1988, after a hearing on August 17, 1987. After receiving the last requested supplemental record on April 6, 1989, this court heard oral argument in this cause on November 7, 1989, and took this cause under submission on that date.
The prosecution's main witness was Judy Wicker,[2] who has been convicted and sentenced to life imprisonment for the murder of the victim, her husband.[3] She admitted that she had not implicated Arthur or herself during her trial and that she had not told the truth. She also admitted that the prosecution told her that, if she told the truth in this case, a good word would be put in for her with the parole board.
In regard to her relationship with Arthur, Wicker testified that she had known Arthur from years past; that, when he was assigned to work release, he called her first; and that she first saw him in December. She also acknowledged that, after the murder, she continued to date Arthur and that he called her many times.
Wicker further revealed that, since March 1981, she and her sister, Theresa Rowland, had had discussions about having the victim killed. She explained that she and the victim had had physically violent arguments and that the victim and Rowland did not get along because they argued over the victim having burned down Rowland's house for her and because the victim had threatened to send her to jail for the arson. She also testified that, in April 1981, she and Rowland had an agreement with Theron McKinney, Rowland's boyfriend, that he would harm the victim; that the three of them had planned to kill the victim and were having him followed; that the victim had been in fear of a black man who had been following him; that McKinney put up $5000, in March, to have the *1168 victim killed; and that, at one point, Rowland planned to kill him herself.
Wicker gave the following rendition of facts surrounding the murder: Sometime prior to the shooting, Rowland called Wicker's daughter from another marriage and told her that "there was going to be an accident, but [Wicker] wouldn't be hurt too bad." On the morning of the murder, after Wicker took her other two children (from her marriage with the victim) to school, she met Rowland and Arthur near the airport. She observed Arthur "doing something to himself" in Rowland's car. He was disguised as a black person; he was wearing an Afro wig and black gloves, and his face was black. Arthur, who had been drinking, got into Wicker's car. He had a gun about 12 inches long, which was in his hand and covered with a towel, and, also, a garbage bag. While he directed her to her house, she begged him not to "do what he was going to do." He responded that the "son-of-a-bitch deserved to die." After they arrived at the Wicker house and entered the den, Arthur began knocking over things. He went into the bedroom where the victim was sleeping and pulled everything from the closet and dresser drawers. The victim did not wake up during this commotion. Then, after Arthur shot the victim, he returned to the den where Wicker was, and he hit her. She remembered nothing else until the police arrived. However, right after the incident, she called Rowland. She received extensive injury to her lip, she was bruised over her body, and several teeth were knocked out.
In regard to the victim's failure to awaken after Arthur entered the house, Wicker testified that she thought Rowland had put some kind of drug in the liquor that Rowland had brought to the victim and that he had consumed on the night before his death. In fact, she testified that Rowland had told her that she put a "knock-out" drug in his liquor. Wicker also testified that normally the victim would have been awakened by such commotion because he was not a very sound sleeper.
Wicker also testified that she received $90,000 in insurance proceeds; that, before the murder, Rowland and McKinney paid Arthur some money, so after the murder, she "repaid" Rowland $6,000 and gave McKinney the victim's Trans Am automobile; that, after the murder, Arthur asked her numerous times for money; that she gave him $10,000 in cash; and that, after she paid him, he threatened her about the money. Wicker further revealed that the money found on Arthur when he was transferred to the county jail on March 16 was not part of the payment from her because he gave the payment money to Norman Roby, an attorney. Finally, Wicker testified that Arthur obtained the gun from his son and that he told her what to tell the police.
The prosecution's other witnesses presented testimony to the following effect. While on work release, Arthur worked at Joel Reagan Mobile Homes in Decatur for minimum wage. His boss saw Wicker visit Arthur twice at work. He also sold Arthur a car for $2,000.
While on work release, Arthur met Deborah Tines, the manager of Cher's Lounge, a "go-go" club. Several weeks after they met in December, Arthur questioned Tines about whether or not she carried a gun. During this conversation, he asked if she knew that a .22 is an assassin's gun and if "hot" guns ever came through the club.
Sometime in December or January, Arthur asked Patsy Yarbrough, a waitress at Cher's Lounge, about obtaining some "jars," a "knock-out drug."
The Decatur Work Release Center's records show that, on Sunday, January 31, Arthur signed out to work at 9:30 a.m. and signed in at 7:00 p.m. On the afternoon of January 31, Arthur asked Yarbrough to get him some .22 caliber Mini-Mag long rifle bullets. He gave her $10, and he assured her that, even though someone was going to be killed, she should not worry about violating her probation because, since the killing was going to be in Tennessee, nothing could be traced back to her. About 5:30 p.m., Yarbrough sent for Terry Lewis and gave him a slip of paper with the *1169 requested type of ammunition written on it. Lewis then left, purchased the requested ammunition at a Woolco store close to closing time, returned to Cher's, and gave the bullets to Yarbrough. A telephone record shows that a phone call was made to Arthur's father's residence from Reagan Mobile Homes at 6:11 p.m. Approximate driving time from Woolco to Cher's is 10 minutes and from Cher's to Reagan Mobile Homes is 20 minutes.
Sometime later, Arthur asked Gene Moon, a fellow inmate at the work release center, if Moon thought Yarbrough would say anything about buying some bullets for him. He also told Moon that he had a gun.
The work release center's records for February 1 show that Arthur signed out for work at 6:00 a.m., that he called for a ride from Reagan Homes to the center at 7:10 p.m., and that he arrived at the center at 7:50 p.m.
On February 1, an officer, at a school crossing, observed Wicker at approximately 7:40 a.m. driving east toward the airport and, about 10 minutes later, he observed her going back toward her house. He saw no one else with her either time.
Later that same morning, at 9:12 a.m., officers received a call to proceed to the victim's residence. There, they found the house to appear to have been ransacked. However, nothing was torn up or thrown around. Wicker was lying on the floor with her sister, Theresa, kneeling beside her. Wicker was crying and appeared to have been beaten. Her clothes were ripped. The victim's body was discovered on a bed in a bedroom. Four new .22 caliber expended cartridge cases, CCI brand, were found on the bed. Mini-Mag long rifle cartridges are consistent with this type of casing. Although four casings were found, the victim received only one bullet wound and there were no other bullet holes in the house. The officers found no indication of a forced entry. The murder weapon was never found. The hairs taken from the victim's clothes and, also, those vacuumed from the den were not Arthur's.
An autopsy was performed on the victim. The cause of death was a close range wound through the right eye while the eyelid was closed. A .22 caliber long rifle bullet was removed from the victim. This bullet severed the victim's brain stem.
About 11:00 a.m. on the day of the murder, Tines went to lunch with Arthur. During their visit, Arthur drove to the Interstate bridge over the Tennessee River; stopped on the bridge; and threw, into the middle of the river, a black garbage bag that he had taken from the back seat. The bag was close to half full. Arthur explained to Tines that he had to get rid of some old memories.
That same day, Wicker's automobile was found parked in the parking lot of Northwest Junior College in Tuscumbia. A black wig, the victim's purse, and a large amount of Negroid hair that had been forcibly removed were found in the vehicle. The inside of the wig contained no hairs.
On March 16, prison officials discovered a discrepancy between the amount of time Arthur had supposedly been working and the amount of time for which he had been paid in his paychecks, which he was required to deposit. Arthur was taken to Morgan County jail, pending investigation. After he left, his personal belongings were inventoried. In an overcoat pocket was a Joel Reagan Mobile Home envelope containing 20 $100 bills. On the envelope was written "$2,000 for trailer on back row." Possession of this money was contrary to the prison regulation that a work release inmate can have only $30 in his possession.
Officer Halladay, shift supervisor, interviewed Arthur on March 17 about Arthur's possession of the money. Arthur explained to him that, on March 16, while he was the only worker on the lot, a woman came by Reagan Homes and left the money for Reagan's partner and that he did not want to leave it there, so he took it back to the center. Arthur could give no name or description of the woman. When asked if he would write out a statement, he refused, saying that he did not trust them and that he wanted to talk with an attorney.
*1170 On April 2, Muscle Shoals Police Department Chief of Detectives Robert Hall interviewed Arthur. Arthur indicated that he knew nothing about a homicide and did not know Wicker or Rowland. Then, when the officer confronted Arthur with information to the contrary, Arthur stated that he did not want to talk anymore and that he wanted an attorney.
Arthur did not testify on his behalf. Among his witnesses was a latent fingerprint examiner who testified that none of the latent prints lifted from the Wicker residence, Wicker's car, and the $2,000 matched Arthur's prints; a neighbor of the Wickers who testified that he observed a green van in the vicinity of the Wicker residence five to fifteen minutes before the police arrived; and the clerk at the Colbert County Sheriff's Department, who testified that, at 12:15 p.m. on February 1, a female caller stated that a car that fit the wanted vehicle's description could be found at the junior college. Another neighbor of the Wickers testified that, at approximately 8:45 a.m. on February 1, she observed two men in a rose-colored Lincoln driving unusually slow by her house, as if they were looking for someone. She further explained that her residence looks very similar to the Wicker residence.
Regina Carroll, in prison on a 50-year sentence for first degree robbery and escape, testified that, in 1982, Wicker told her that she and Arthur were not guilty and that a black man was the murderer; that, later, Wicker said she would do anything to leave prison; and that, when Wicker left the prison for Arthur's trial, she packed all of her belongings and said that she was not returning. Regina's husband, Bruce Carroll, an inmate incarcerated for robbery, also testified. He admitted to two prior convictions for robbery, two for burglary, and one for theft. He explained that, on December 3, 1981, he went to Reagan Mobile Homes to buy a trailer; that, instead, he and Arthur played poker; and that he lost $6,500, part of his purchase money, to Arthur.

I
Because this is a death case, we are required, pursuant to A.R.A.P. 45A, to review the record for error, even in the absence of an objection. Ex parte Johnson, 507 So.2d 1351, 1356 (Ala.1986). Rule 45A requires this court to "notice any plain error or defect ..., whether or not brought to the attention of the trial court, and [to] take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant." The accused's failure to preserve an issue, "while weighing against Defendant as to any possible claim of prejudice, serves as no impediment to our scope of review pursuant to the `plain error' mandate in death penalty cases." Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
During the presentation of the State's evidence, Officer Halladay testified about the statement he took from Arthur. Halladay testified, before the jury, to the following: On March 16, 1982, he discovered the discrepancy, so Arthur was taken to the Morgan County jail. After the $2,000 was found in Arthur's coat, on March 17, Halladay interviewed Arthur at the jail. After Halladay read Arthur his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Arthur asked Halladay why he was reading his rights to him. Halladay revealed, to Arthur, the discovery of the $2,000 and explained that he wanted to know how the money got into Arthur's pocket. After Arthur gave Halladay his explanation, Halladay asked Arthur to write out his statement. "At that time he said no, that he did not trust [him], and that he wanted to talk to his attorney." The interview then ended.
After Halladay's testimony, Chief Hall testified about his interview with Arthur on April 2, 1982, at the Morgan County sheriff's office. He testified, before the jury, to the following: He and the chief of detectives of the Sheffield Police Department asked the Morgan County authorities if they might talk to Arthur. After the latter *1171 agreed, Arthur was brought in, read his Miranda rights, and told that they wanted to talk to him about a homicide. He indicated that he did not know what they were talking about. He was then asked if he knew anyone by the name of Judy Wicker or Theresa Rowland. At first, he responded that he knew no one by either name, and then he said he once knew a girl named Judy. The officers then showed him photographs of the two women, and he denied knowing either one of them. Then, the officers confronted him with evidence they had obtained that clearly conflicted with his denials. After this testimony, Hall stated the following:
"At that time [Arthur] said, fellows, it's kind of like playing dodge ball when you're in school. You have got the dodge ball and I don't have anything. I don't think I want to talk to you any more. So at that time we stopped talking to him. He indicated that he wanted an attorney. We did not talk to him any more at that time."
Finally, Hall was asked if he talked to Arthur a second time. He answered, "We went back to attempt to talk to him in the presence of his attorney, Norman Roby...."
During closing arguments, the prosecutor focused on appellant's assertion of his rights to remain silent and to counsel during appellant's first statement when he stated, after reiterating the contents of the first statement, that "there was no further statement at that time to Patrick Halladay." He also reiterated, several times, the contents of appellant's second statement. In regard to appellant's assertion of his rights during the second statement, the prosecutor stated that, after appellant was confronted with the information connecting him with Wicker and Rowland, "he doesn't have much else to say after that".[4]
Defense counsel failed to object to the introduction of Arthur's statement to Officer Hall, and the propriety of this testimony was not raised in the briefs submitted on appeal. However, we find that this testimony was a clear violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), wherein the Supreme Court followed the Miranda Court's holding that if an accused, during custodial police interrogation, requests counsel, "the interrogation must cease until an attorney is present," 384 U.S. at 474, 86 S.Ct. at 1628. In reaffirming this rule, the Edwards Court explained, as follows:
"[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."
451 U.S. at 484-85, 101 S.Ct. at 1884-85 (footnote omitted).
The Court, in Arizona v. Roberson, 486 U.S. 675, 680-81, 108 S.Ct. 2093, 2097-98, 100 L.Ed.2d 704 (1988), expounded upon the "bright-line" Edwards rule, as follows:
"The rule of the Edwards case came as a corollary to Miranda's admonition that `[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present.' 384 U.S., at 474[, 86 S.Ct. at 1628]. In such an instance, we had concluded in Miranda, `[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' Id., at 475 [86 S.Ct. at 1628]. In Edwards, we `reconfirm[ed] these views and, to lend *1172 them substance, emphasize[d] that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel' 451 U.S., at 485 [101 S.Ct. at 1885]. We concluded that reinterrogation may only occur if `the accused himself initiates further communication, exchanges, or conversations with the police.' Ibid. Thus, the prophylactic protections that the Miranda warnings provide to counteract the `inherently compelling pressures' of custodial interrogation and to `permit a full opportunity to exercise the privilege against self-incrimination,' 384 U.S., at 467[, 86 S.Ct. at 1624], are implemented by the application of the Edwards corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the `inherently compelling pressures' and not the purely voluntary choice of the suspect." (Emphasis added.)
Thus, the prosecution had the "heavy burden" of overcoming the presumption, which was raised by Arthur's request for counsel, that Arthur considered himself unable to deal with the pressures of custodial interrogation without legal assistance. "[The] discomfort [with the pressures of custodial interrogation] is precisely the state of mind that Edwards presumes to persist unless the suspect himself initiates further conversation about the investigation...." Id. 486 U.S. at 684, 108 S.Ct. at 2099.
As Arizona v. Roberson makes clear, this presumption does not disappear simply because the accused, after asserting his right in an initial interrogation, is subsequently interrogated by a different officer, who is unaware of the accused's request, and about a separate offense. Id. at 683, 687, 108 S.Ct. at 2098, 2101. The Court observed the following:
"Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists. The police department's failure to honor that request cannot be justified by the lack of diligence of a particular officer. Cf. Giglio v. United States, 405 U.S. 150, 154 [92 S.Ct. 763, 766, 31 L.Ed.2d 104] (1972)."
Id. at 687-88, 108 S.Ct. at 2101 (footnote omitted). Cf. Michigan v. Jackson, 475 U.S. 625, 634, 106 S.Ct. 1404, 1410, 89 L.Ed.2d 631 (1986) (wherein the Court held that, in regard to whether the interrogating officer knew of the defendant's request for an attorney at arraignment, "Sixth Amendment principles require that we impute the State's knowledge from one state actor to another").
In determining that the prophylactic rule of Edwards should have been followed here, we are guided by the following analysis set forth by the Court in Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984):
"First, courts must determine whether the accused actually invoked his right to counsel.... Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." (Citations omitted.)
There is no question that Arthur invoked his right to counsel on March 17. Moreover, the record readily supports the inference that Arthur did not initiate the conversation of April 2. See Fortier v. State, 515 So.2d 101 (Ala.Cr.App.1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 776, 98 L.Ed.2d 862 (1988). Thus, Arthur could have constitutionally been subjected to further interrogation only had he been accorded the opportunity to consult with counsel. See Ex parte Johnson, 522 So.2d 234, 238 (Ala. 1988). However, the record fails to mention any reference to Arthur's having had access to an attorney after the first interrogation.
*1173 We cannot presume, from a silent record, that counsel was made available. In the Miranda opinion, the Court reviewed the California Supreme Court's reversal of the conviction of Roy Allen Stewart for which he received the death penalty. 384 U.S. at 497-99, 86 S.Ct. at 1639-41. In affirming the lower court's holding that Stewart's confession was inadmissible on its declaration that "it would not presume in the face of a silent record that the police advised Stewart of his rights," id. at 498, 86 S.Ct. at 1640, the Miranda Court explained the following:
"In dealing with custodial interrogation, we will not presume that a defendant has been effectively apprised of his rights and that his privilege against self-incrimination has been adequately safeguarded on a record that does not show that any warnings have been given or that any effective alternative has been employed. Nor can a knowing and intelligent waiver of these rights be assumed on a silent record."
Id. at 498-99, 86 S.Ct. at 1640. See also Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962) (wherein the Court stated that "[p]resuming waiver [of assistance of counsel] from a silent record is impermissible"); Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942) (wherein the Court declared that "we indulge every reasonable presumption against the waiver of fundamental rights").
Clearly, the prosecution had the burden of establishing that Arthur had the opportunity to consult with counsel prior to the April 2 interrogation. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda v. Arizona, 384 U.S. at 475, 86 S.Ct. at 1628.
"It is a well settled rule of law in Alabama that a statement made subsequent to arrest is prima facie involuntary and inadmissible at trial, and the State must demonstrate voluntariness and a Miranda predicate in order to gain admission of the statement."
Ex parte Johnson, 522 So.2d at 235-36 (quoting Crowe v. State, 485 So.2d 351, 359 (Ala.Cr.App.1984), rev'd on other grounds, 485 So.2d 373 (Ala.1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1986) (citations omitted)). See also Ex parte Callahan, 471 So.2d 463, 464 (Ala.), cert. denied, 474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985). "Confessions are presumed to be involuntary...." Ex parte Shula, 465 So.2d 452, 453 (Ala.1985). "The record must affirmatively show that [the prosecution's] burdens have been met." Ex parte Callahan, 471 So.2d at 471. Based upon these principles, we must conclude that, since the prosecution introduced nothing to the contrary, Arthur had no opportunity to consult with counsel; the presumption of the statement's inadmissibility was not rebutted.
In determining whether this Edwards violation constitutes "plain error," we observe the standard announced by our supreme court, which has been explained as follows:
"In interpreting and applying Alabama's plain error rule, the Alabama Supreme Court has looked to the Federal Rules of Criminal Procedure definitions of `harmless error' and `plain error' (Fed.R. Crim.P. 52) and to the cases interpreting the federal plain error rule. See Ex parte Harrell, 470 So.2d [1309,] 1312-13 [(Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)]; Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986[, 104 S.Ct. 436, 78 L.Ed.2d 367] (1983). In Harrell, the court followed the Womack court's holding that the plain error rule is intended to apply to `particularly egregious error' which would result in a miscarriage of justice if a reversal was denied. The Harrell court also followed Womack`s conclusion that this interpretation of plain error follows the federal plain error rule, as stated in United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981): `"Plain error" only arises if the error is so obvious that the failure to notice it *1174 would seriously affect the fairness or integrity of the judicial proceedings.' See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987) (following Harrell and Womack)."

Murry v. State, 562 So.2d 1348 (Ala.Cr. App.1988). See also Ex parte Hinton, 548 So.2d 562, 568 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989) (following Womack); Bankhead v. State, [Ms. 6 Div. 370, September 29, 1989] (Ala. Cr.App.1989). We need not concern ourselves with the quantity of evidence, for "the proper inquiry here is not whether evidence of the defendant's guilt is overwhelming but, instead, whether a substantial right of the defendant has or probably has been adversely affected." Ex parte Johnson, 507 So.2d 1351, 1356 (Ala.1986). See also Ex parte Tomlin, 540 So.2d 668, 672 (Ala.1988). Nevertheless, we have reviewed the error against the entire record and find that it, in all likelihood, had an unfair prejudicial impact on the jury. Thus, we conclude it undermined the fairness of the trial and contributed to a miscarriage of justice.
Under these principles, we hold that the admission of Arthur's April 2 statement was "plain error." "The fifth amendment privilege against self-incrimination protects an individual from being compelled by the state to be a witness against [him]self." Special Project, Eighteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1987-1988, 77 Geo.L.J. 489, 640 (1989) (footnotes omitted). Here, although Arthur did not testify, he, in essence, was compelled to testify that, when confronted with evidence of his association with Wicker and Rowland, after having adamantly denied any association, he asserted his right to an attorney and cut off any further conversation with the authorities.
The fact that the April 2 statement is not a direct confession does not negate the application of the Edwards rule or diminish its prejudicial impact. We find apropos the following observation of the Miranda Court:
"The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner.... [N]o distinction may be drawn between inculpatory statements and statements alleged to be merely `exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement."
384 U.S. at 476-77, 86 S.Ct. at 1629. See also Rhode Island v. Innis, 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 1690 n. 5, 64 L.Ed.2d 297 (1980) (where the Court observed that the term "incriminating response," in regard to interrogation, refers to "any responsewhether inculpatory or exculpatorythat the prosecution may seek to introduce at trial") (emphasis in original).
Even assuming arguendo that Arthur conferred with counsel prior to his statement on April 2, "the burden remain[ed] upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation," Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983) (plurality opinion). In our review under the "plain error" standard, we have noted other deficiencies with the predicates necessary for the proper admission of Arthur's two statements. In regard to the first statement, Officer Halladay merely testified that he "read the Miranda warnings and Miranda rights to Tommy Arthur." He was not asked, and did not indicate, what specific rights he advised and if Arthur knowingly, intelligently, and voluntarily waived those rights. Likewise, in regard to the second statement, Officer Hall merely testified that "[Arthur] was read his Miranda *1175 rights." Hall also did not indicate, nor was he asked, what specific rights he advised and if Arthur knowingly, intelligently, and voluntarily waived those rights. In order to use Arthur's statements at trial, the prosecution had to prove that Arthur knowingly, intelligently, and voluntarily waived his rights prior to making the statements. Miranda v. Arizona; Ex parte Crowe, 485 So.2d 373 at 377-78; Shula v. State, 465 So.2d 448, 450 (Ala.Cr.App.1984), rev'd on other ground, 465 So.2d 452 (Ala.1985). The generalized statement that "[Arthur] was read his Miranda rights" is not a sufficient predicate. See Swicegood v. State, 50 Ala.App. 105, 277 So.2d 380 (1973).
The "plain error" was exacerbated by the prosecutor's references to Arthur's assertions of his right to remain silent and his right to consult with an attorney.
"[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."
Miranda v. Arizona, 384 U.S. at 468, n. 37, 86 S.Ct. at 1624-25, n. 37 (citations omitted).
Our supreme court followed this principle in Ex parte Wiley, 516 So.2d 816 (Ala. 1987), where it reversed on the admission of the following testimony by a state's witness:
"[The defendant] stated that he understood his rights, and before he gave any statement, he wished for his lawyer to be present, and he did not want to sign anything."
Id. at 817. In so holding, the court stated,
"It was error for the trial court to conclude in substance that when the defendant waived his right to remain silent by making a statement to the police at the scene of the crime, he could not reclaim the right to remain silent at the police station and keep that assertion from being used against him in court."
Id. at 818. (emphasis added). See also Timmons v. State, 410 So.2d 454, 455 (Ala. Cr.App.1981) (wherein the court reversed on finding prejudicial the officer's testimony, "I talked to [the defendant] and advised him of his rights and he refused to make any statement at all to me until he conferred with an attorney"); Sullivan v. State, 351 So.2d 659, 665 (Ala.Cr.App.), cert. denied, 351 So.2d 665 (Ala.1977) (wherein the court held that the detective's testimony that he had been advised that the defendant would not make any statement was improper); Edwards v. State, 344 So.2d 807 (Ala.Cr.App.), cert. denied, 344 So.2d 812 (Ala.1977) (wherein the court ruled as inadmissible testimony that the defendant, after being given his Miranda warnings, stated that he did not wish to make any statement and refused to sign the rights form). The prosecutor "must scrupulously avoid all reference to or use of an accused's assertion of his right to remain silent." Houston v. State, 354 So.2d 825, 828 (Ala.Cr.App.1977), cert. denied, 354 So.2d 829 (Ala.1978). This prohibition also applies to an assertion of the right to counsel. "[T]he evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized" is clearly impermissible. Wainright v. Greenfield, 474 U.S. 284, 295, 106 S.Ct. 634, 640, 88 L.Ed.2d 623 (1986).
We do not lightly reverse this cause for yet another trial, but given the seriousness of this cause and the record's absolute void of evidence on the constitutional predicate necessary for the admission of the April 2 statement, we are compelled to reverse. Although this court considers that it "has always given ample latitude to law enforcement agencies in the legitimate exercise of their duties," 384 U.S. at 481, 86 S.Ct. at 1631, we must also follow the mandates proclaimed by the United States Supreme Court to protect individual rights. "Edwards is grounded in the understanding that `the assertion of the right to counsel [is] a significant event,' 451 U.S., at 485, [101 S.Ct. at 1885], and that `additional safeguards are necessary when the accused asks for counsel.' Id., at 484 [101 *1176 S.Ct. at 1884]." Michigan v. Jackson, 475 U.S. at 636, 106 S.Ct. at 1411.
Although we reverse, we feel constrained to comment on several issues raised by Arthur.[5]

II
Arthur contends that a reversal is warranted because of testimony from the prosecution's rebuttal witness Steve Brantley, senior investigator of investigation specialties for the Department of Corrections, and closing argument remarks about the "unwritten rule" among prison inmates that inmates do not testify against other inmates without suffering reprisals. Arthur argues, as he did at trial, that such testimony and comments suggest that he is dangerous and that he threatened Wicker, Moon, and Yarbrough, who were inmates at the time of their testimony. The prosecutor argued, at trial, that this testimony was to rebut testimony from defense witnesses that it is "no big deal" for one inmate to testify against another and, also, to rebut the defense's insinuation that Wicker was receiving special treatment in return for her testimony.
On direct examination, Wicker testified that the only agreement she had with the State was that, if she told the truth, the district attorney would "put in a good word" for her at the parole board. Wicker was questioned, on cross-examination, about the agreement, but nothing further was disclosed. There was no intimation, during cross-examination, that Wicker was going to another place of confinement after Arthur's trial. Then, during Wicker's redirect examination, she was asked the following: "[Defense counsel] asked you about any promises that have been made to you to get you to testify. Have any threats been made to you about testifying in this case?" Wicker answered, "By some of the inmates."
Then, during the defense's examination of its witness Regina Carroll, one of Wicker's fellow inmates, Carroll testified that, when Wicker left Julia Tutwiler Prison to testify in this case, she packed up all her belongings and said she was leaving and not coming back. On cross-examination, the prosecutor questioned Carroll about the "unwritten rule." Carroll testified that it is not necessarily unpopular for an inmate "to turn State's evidence." In regard to Wicker's moving her belongings, the prosecutor asked, "You know the reason that she did was because of security problems, don't you?"
During the prosecutor's cross-examination of defense witness Bruce Carroll, Regina's husband and an inmate in the penitentiary system, the prosecutor asked Carroll of "the feeling in the penitentiary among the inmates about someone testifying against an inmate." Carroll answered as follows: "They like to do it all the time. They think that they can get some kind of break." He also testified that other inmates do not get upset about it and that he does not know of anyone having been threatened in the last 25 years.
In rebuttal, the prosecution called Steve Brantley, who testified that, on occasion, he investigated problems among inmates which were the result of one inmate's informing on or testifying against another inmate; that such occasions are common occurrences; and that there is an "unwritten rule" about inmates testifying against another. Brantley further testified that it is not unusual for an inmate witness to remove his or her personal belongings from the place of incarceration because "[n]ormally when one inmate is brought forward to testify for the State, they generally will ask for protective custody and transfer to another institution." On cross-examination, Brantley explained that, in the case of a female prisoner, the only place in Alabama to which she could be moved is the Birmingham Work Release program, but that she could also be moved to another state or to a federal institution.
In its closing remarks during the trial phase, the prosecution, in referring to this testimony, stated the following:

*1177 "Now, they have gone into this thing over and over again about she's going to get some kind of special treatment out of this. The State has promised her this, that and the other. Well, you know, I'm not ashamed to say that if Judy Wicker was willing to come forward and tell the truth in this case, I'm not ashamed to say that I will go down to the Board of Pardons and Paroles and will report to them that she testified truthfully in this case and that she assisted the State. If she's willing to do that and put up with all the reprisals from the other inmates and put up with all the pressures that the other inmates will put on her
"....
"She testified to you herself that other inmates didn't want her to come up here and testify. I submit to you that common sense will tell you that there is an unwritten rule among inmates. You testify against another inmate and we're going to make life hard on you. If she's willing to do that, then I don't think it's too much for me as a representative of the State of Alabama to go before the Pardons and Parole Board and mention to them that she did that, she testified truthfully and she helped the State in this case."
Clearly, the prosecution first injected or elicited the fact that Wicker had received threats about testifying in this case. (We note that defense counsel failed to object to this instance; however, as explained earlier, we are not here concerned with the issue of preservation.) The prosecution's argument that Brantley's testimony was to rebut the Carrolls' testimony ignores this fact that the prosecutor initially brought out the subject by a State's witness. Without the initial question asked of Wicker, any questioning about threats generally would have been irrelevant and immaterial.
However, this first question of Wicker never should have been asked. And, consequently, the subsequent testimony of various witnesses and the prosecutorial comments compounded the error. The introduction of such testimony and the accompanying prosecutorial comments present a number of problems. Foremost, the evidence of threats is circumscribed by the following:
"A threat by a third person against a... witness is relevant only if the defendant is linked in some way to the making of the threat. Thus, evidence that a witness received an unsigned letter containing a threat should be excluded if there is no evidence to connect the defendant with it."
C. Torcia, 1 Wharton's Criminal Evidence § 157 (14th ed. 1985) (footnote omitted). "Evidence of an attempt by a non-witness third person to suppress testimony is admissible if, but only if, it is shown that the party against whom such evidence is offered, procured, promoted or approved such attempt." C. Gamble, McElroy's Alabama Evidence § 190.03 (3d ed. 1977) (footnote omitted). See also Sims v. State, 146 Ala. 109, 41 So. 413 (1906); Stewart v. State, 398 So.2d 369 (Ala.Cr.App.), cert. denied, 398 So.2d 376 (Ala.1981). The prosecutor made absolutely no attempt to link, to Arthur, the threat made to Wicker. In fact, at trial, the prosecutor claimed that Brantley's testimony had nothing to do with Arthur directly. Moreover, we neither know of, nor have been directed, by the prosecutor or attorney general, to, an exception to the hearsay rule allowing such testimony. Finally, any relevancy of the evidence of Wicker's receiving threats as rebuttal to the defense's insinuation that Wicker was receiving special treatment in return for her testimony is heavily outweighed by the damaging and prejudicial nature of the testimony.
We express concern that the whole purported necessity for the testimony arose from ambiguity on the question of Wicker's fate after testifying. The record presents a real possibility that Wicker was not going to be returned to Tutwiler. Such information would certainly have been within the prosecutor's knowledge, but rather than clarifying the situation, as he was required to do, see Ex parte Womack, 541 So.2d 47 (Ala.1988), he chose to use the confusion as an opportunity to inject more innuendoinnuendo that maybe Arthur was behind the threats to Wicker and that maybe she removed *1178 her personal belongings when she left Tutwiler because the threats were so serious that she, for her safety, was going to be placed in protective custody. See also Ex parte Monk, 557 So.2d 832 (Ala. 1989).

III
On redirect examination of Wicker, the prosecutor elicited the fact that her lawyer did not appeal her conviction to the Alabama Supreme Court, contrary to her request. She was then asked, "When this case first started out, did your attorney have two clients in this case?" Before defense counsel objected, Wicker answered, "Yes." After the trial court sustained Arthur's objection, the prosecutor asked, "Do you know whether or not your former attorney ever represented Tommy Arthur in this case?" Arthur's objection was sustained. The prosecutor then elicited, over Arthur's objection, that Wicker had given money to Arthur who, in turn, had given it to Norman Roby to be put in an escrow account. Shortly after this testimony, Chief Hall testified, without objection, that prior to any charges, Roby was representing both Wicker and Arthur and that, after Arthur invoked his right to counsel in his first interview with Hall, Hall returned to attempt to talk with Arthur in the presence of his attorney, Roby. After the testimony, the prosecutor made the following remarks in his closing argument:
"Now, I don't know if you caught this in the testimony, but Judy Wicker testified without an objection, it's undisputed that the $10,000 that she paid to Tommy Arthur went in Norman Roby's trust fund. Do you recall her saying that. Went in Norman Roby's trust fund. Who was that? That was the lawyer who attempted to represent both Tommy Arthur and Judy Wicker. That's also the lawyer who dropped her appeal after it went to the Court of Criminal Appeals."
The trial court overruled Arthur's objection to these comments.
The unavoidable inference from the above-stated testimony and closing remarks is that since Arthur was, at one time, represented by the same attorney who represented Wicker (who readily admits her guilt) and who apparently decided it would be futile to pursue further appellate review of Wicker's conviction, surely Arthur is also guilty. Even the attorney general asserts that the testimony of Roby's joint representation "was competent evidence from which the jury could reasonably infer Appellant's guilt." However, we find that therein lies the problem.
In McDonald v. State, 620 F.2d 559 (5th Cir.1980), the court, in determining that the prosecutor's elicitation of testimony that the appellant's lawyer was present when law enforcement officials searched his home pursuant to a search warrant and his closing comments on this testimony violated the appellant's Sixth Amendment right to counsel, stated the following:
"The Supreme Court has held that prosecutorial comments on an accused's failure to testify [, Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965),] or on his silence at the time of his arrest [, Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976),] infringe upon his Fifth Amendment right against compulsory self-incrimination. The Supreme Court has not yet addressed the effect of prosecutorial comments on an accused's exercise of his right to counsel. Several circuit courts have.
"In United States ex rel. Macon v. Yeager, 476 F.2d 613 (3rd Cir.1973), the court reversed a murder conviction because the prosecutor had claimed in his closing argument that the defendant's actions immediately after the commission of the crime, including his hiring of an attorney, were inconsistent with his claim of innocence. The Macon court further held that the evidence in the case was such that the error could not be considered harmless. In United States v. Liddy, 509 F.2d 428 (D.C.Cir.1974), and United States v. Williams, 556 F.2d 65 (D.C.Cir.1977), the court found error in references to the defendants' exercise of their right to counsel but held that the errors were harmless. In Zemina v. Solem, 573 F.2d 1027 (8th Cir.1978), the *1179 court, without discussing the issue of harmless error, reversed a manslaughter conviction because the prosecutor had suggested that the defendant's post-arrest telephone call to his lawyer indicated his guilt."
Id. at 562 (footnotes omitted). Then, after discussing its treatment of a similar situation in Stone v. Estelle, 556 F.2d 1242 (5th Cir.1977), cert. denied, 434 U.S. 1019, 98 S.Ct. 742, 54 L.Ed.2d 767 (1978), the court explained that, to be impermissible, the questioning and comment must be directed at the defendant's story rather than some collateral matter. 620 F.2d at 563. Applying this standard, the court held that the reference to the attorney's presence penalized McDonald for exercising his Sixth Amendment right to counsel because the real purpose of the reference was to cause the jury to infer that McDonald was guilty. Id. at 564.
In answer to the government's contention that, given the quantity of evidence against McDonald, this error was harmless, the McDonald court stated the following:
"Violations of some constitutional rights may be considered harmless errors. Chapman v. California, 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] ... (1967). However, `there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' Chapman, 386 U.S. at 23 [87 S.Ct. at 827].... We held in United States v. Hammond, 598 F.2d 1008 (5th Cir.1979), that the denial through governmental misconduct of a defendant's right to present witnesses to establish a defense may never be considered harmless error. We consider the error in this case to be harmful per se.
"Comments that penalize a defendant for the exercise of his right to counsel and that also strike at the core of his defense cannot be considered harmless error. The right to counsel is so basic to all other rights that it must be accorded very careful treatment. Obvious and insidious attacks on the exercise of this constitutional right are antithetical to the concept of a fair trial and are reversible error."
Id.
We readily admit that the Sixth Amendment may not now be a permissible basis upon which to decide such an issue. The Supreme Court has clearly held that the existence of an attorney-client relationship does not trigger the protections of the Sixth Amendment; that rather the right to counsel attaches at the first formal charging proceeding. Moran v. Burbine, 475 U.S. 412, 428, 430, 106 S.Ct. 1135, 1144, 1145, 89 L.Ed.2d 410 (1986). See also Sulie v. Duckworth, 689 F.2d 128 (7th Cir. 1982), cert. denied, 460 U.S. 1043, 103 S.Ct. 1439, 75 L.Ed.2d 796 (1983). Even assuming that our cited authorities do erroneously rest their holdings on the Sixth Amendment, we still find them to be authoritative. They illustrate the intense distaste that courts have for like testimony and comments. See also United States v. Milstead, 671 F.2d 950, 953 (5th Cir.1982) (wherein the court declared such questioning as "[r]eprehensible ... and severely to be condemned").
We can conceive of no legitimate reason why the testimony and subsequent comments were proper. "A defendant's decision to consult an attorney is not probative in the least of guilt or innocence, and a prosecutor may not `imply that only guilty people contact their attorneys.'" Commonwealth v. Person, 400 Mass. 136, 508 N.E.2d 88, 91 (1987) (quoting Zemina v. Solem, 438 F.Supp. 455, 466 (D.S.D.1977), aff'd, 573 F.2d 1027 (8th Cir.1978)).
"[I]n no situation in a criminal trial ... do we feel the mere act of hiring an attorney is probative in the least of the guilt or innocence of defendants. `[L]awyers in criminal cases are necessities not luxuries,' Gideon v. Wainwright, 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799] ... (1963), and even the most innocent individuals do well to retain counsel. See also, Powell v. Alabama, 287 U.S. 45, 68-69 [53 S.Ct. 55, 63-64, 77 L.Ed. 158]... (1932); Sulie v. Duckworth, 689 F.2d 128, 131 (7th Cir.1982)." *1180 Bruno v. Rushen, 721 F.2d 1193, 1194-95 (9th Cir.1983), cert. denied sub nom. McCarthy v. Bruno, 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984). "The right to the advice of counsel would be of little value if the price for its exercise is the risk of an inference of guilt." Commonwealth v. Person, 400 Mass. at 141, 508 N.E.2d at 91 (quoting Commonwealth v. Burke, 339 Mass. 521, 533, 159 N.E.2d 856, 863 (1959)).
We find our supreme court's holding and rationale in Ex parte Marek, 556 So.2d 375 (Ala.1989), to be persuasive by analogy. In Marek, the supreme court abolished the tacit admission rule, specifically as it pertains to a tacit admission occurring before an accused is arrested. In so holding, the court acknowledged the following rationale:
"Underlying [the] legal presumption that an accused's silence when he is confronted with an accusation is prompted by his knowledge of his guilt is the premise that an individual who considers himself innocent will deny such an accusation.
"That underlying premise, that an innocent person always objects when confronted with a baseless accusation, is inappropriately simple, because it does not account for the manifold motivations that an accused may have when, confronted with an accusation, he chooses to remain silent.... Furthermore, without that premise that silence in the face of an accusation means that the accused thinks he is guilty, the tacit admission rule cannot withstand scrutiny, because the observation that the accused remained silent could not necessarily lead to the inference that the accused knew that he was guilty; without the premise that silence in the face of accusation necessarily results from guilt, the tacit admission rule merely describes two concurrent events, accusation and silence, without giving the reason for the concurrence of the two events. Accordingly, neither logic nor common experience any longer supports the tacit admission rule, if, indeed, either ever supported it."
Id. at 380-81 (emphasis in original). The court further noted that "[a]lthough the constitutional impediments of the Fifth Amendment may not apply to a tacit admission occurring before an accused is arrested, Miranda, 384 U.S. at 444 [86 S.Ct. at 1612], ..., the fundamental logical problems with the rule remain." Id. at 382. As silence in the face of accusation cannot be attributed to guilt, hiring an attorney cannot be indicative of guilt.

IV
Arthur contends that the prosecutor was guilty of misconduct in making various comments during his closing remarks in both the trial phase and sentencing phase.[6]

A.
The prosecutor repeatedly referred to his personal opinion of the evidence and the credibility of witnesses. Examples of these comments, which were made in his closing arguments during the trial phase, are as follows:
"[W]e certainly have a right and duty and obligation to use [an eyewitness] and to use that testimony if we feel it's believable. I submit to you that Judy Wicker's testimony is believable, is believable."
"You know, we vouch for [the prosecution's witnesses'] credibility. When we put them on the witness stand, we vouch for their credibility. In other words, that they will tell you the truth. We feel like that's what they have done here."
"I can assure you Mr. Wheeler is not going to come in here and lie about anything."
"I'm saying that if [a certain state's witness] had been off as little as that much in the time frame, then I can't see, and I *1181 don't think you can either, that there would be any problem ... with the facts being as they are.... I don't think it's any big problem."
"Bruce Carroll. Anybody who's ever come in here and lied, if I have ever in my life as a prosecutor seen anybody lie on the witness stand ... I saw it in here Saturday when Bruce Carroll testified from that witness stand. I wouldn't believe Bruce Carroll, I don't think."
"Now, you know, when lawyers call a witness, put him on the stand and ask him to testify, he has to vouch for that person's credibility. He has made a determination by checking into that person's story and determining that that is what he believes in his heart is the truth. I submit to you that that's what the State has done in this case. This case didn't happen just overnight. There are a lot of hours of investigation and checking into these people's backgrounds and whether they are telling the truth or not. We didn't just bring these people in here off the street. We vouched for their credibility. Every single witness who took that stand we, the State of Alabama, vouched for their credibility."
The prosecutor continued to express his personal opinion in the sentencing phase, as exemplified by the following: "I have told you how I feel, and I have expressed to you the position of the State...."
In Clark v. State, 462 So.2d 743, 746 (Ala.Cr.App.1984), three members of the court approved of the following prosecutorial comments:
"When I put someone on this witness stand as my witness I vouch for their credibility. Now, anybody can make a mistake on the stand. But, I vouch they are going to be a credible witness."
In so holding, the court noted that "the prosecutor was not personally vouching for the witness who had been called, but rather was arguing to the jury as to the effect of that witness' testimony." Id. at 747. The comments in the case at bar go beyond those of Clark, and we find Clark's concurring opinion, authored by then-Presiding Judge Bowen and in which now-Presiding Judge Taylor joined, to be more apropos here than Clark's majority opinion. Judge Bowen stated the following:
"The prosecutor's comments go beyond the realm of reasonable forensic debate. The majority opinion is somewhat similar to the dissenting opinion of Judge Johnson in McGhee v. State, 41 Ala.App. 669, 671-73, 149 So.2d 1 (1962), which was rejected in McGhee v. State, 274 Ala. 373, 149 So.2d 5 (1963).
".... This is a flagrant violation of the rule.
"`Generally, the authorities indicate that impropriety and prejudice may result just as readily from crediting one's own witness with truthfulness as from charging an opposition witness with faults. While counsel may properly argue as to the weight and sufficiency of the evidence and the credibility of witnesses from the evidence if he neither says nor insinuates that the statement is based on his own personal knowledge or anything else besides the witnesses' testimony at the trial, it is not proper for him to take the position of an unsworn witness as to credibility. Thus, statements by counsel arguing the witness' credibility from his official position or occupation, or counsel's personal acquaintance with the witness, usually for some stated duration of time, are quite regularly construed as reversible error, usually on the ground that such comment constitutes unsworn testimony by counsel.' 75 Am. Jur.2d, Trial § 306 (1974).
"Here, the prosecutor was arguing the witness's credibility based upon his own personal knowledgenot upon the witness's testimony at trial and the evidence before the jury."
Id. at 747-48.
We find the court's later expression on this particular subject of prosecutorial comment, in King v. State, 518 So.2d 191 (Ala. Cr.App.1987), to be a more desirable approach than that of the majority in Clark. There, in the context of reviewing the coram nobis claim that trial counsel was ineffective for failing to object to prosecutorial *1182 comment that was allegedly so prejudicial as to deny the petitioner a new trial, the court reviewed the propriety of the following closing comments:
"On the other hand, and the Defense attorneys are probably going to tell you this, anyway; but the State vouches for what its witnesses say when they put them on the stand. And I do vouch for what my witnesses have said to you. I believe they have been completely honest with what they have told you yesterday and today. They have told you the truth in this case....
"They didn't lie about anything. They did what they told you they did. And they talked to me, some of them did, one of them talked to me one time before we came to Court and I told every one of them, `you better tell the truth when you get on that witness stand' because I cannot bring you what I believe to be falsehoods from the witness stand.
"And I do believe they told you the complete truth."
Id. at 192-93. The court strongly condemned these remarks. We quote at length from now-Presiding Judge Taylor's opinion (with one Judge concurring and three Judges concurring in result), for we can offer no better discussion of the pertinent considerations:
"This court has previously addressed this issue and, following precedent, held that it is highly improper for attorneys, particularly prosecutors, to state their personal opinions during closing arguments. Moseley v. State, 448 So.2d 450 (Ala.Cr. App.1984). Attorneys must be careful to refrain from injecting their own personal experience or knowledge in support of their argument, as distinguished from what they deem to be reasonable inferences to be drawn from the evidence. Moseley, supra; Brown v. State, 393 So.2d 513 (Ala.Cr.App.1981).
Id. at 193. The King court then quoted the following from Moseley, 448 So.2d at 456-57:
"In Adams v. State, 280 Ala. 678, 198 So.2d 255 (1967), our Supreme Court said:
"`It is, of course, never proper for the prosecuting attorney or the defendant's attorney to state in argument to the jury their personal belief in the guilt or innocence of the accused. To do so is to place before the jury for consideration the lawyer's own character and credibility, which is no part of any judicial proceeding. The office of district attorney and counsel for the accused does not demand that the former's duty is to secure a conviction, and the latter's duty to obtain an acquittal; but rather, the primary duty is to see that justice is done. See Canons 5 and 15 of American Bar Association Canons of Professional Ethics. And where, as here, the trial judge attributes beliefs to and sanctions such personal beliefs by opposing attorneys, even though the record was not protected by an exception, we call attention to the error so that it may not be repeated on another trial.'
"The rule was also set forth in Woods v. State, 19 Ala.App. 299, 97 So. 179 (1923), rev'd on other grounds, 20 Ala. App. 200, 101 So. 314 (1924), aff'd, 21 Ala.App. 436, 109 So. 171 (1926), as follows:
"`The personal opinion of the solicitor as to the guilt of the accused or as to any material fact involved in the case is not evidence. It should never be uttered by a prosecuting attorney, and, if the court gives sanction to such an utterance, it thereby commits error necessitating a reversal of [the] conviction appealed from. Inferences and deductions from the evidence may be drawn by counsel almost without limit, but the minds of the jury should not be prejudiced, nor should they be swayed in their deliberations by unauthorized statements in the argument of the solicitor, such as, "In my honest opinion, and before God it is my honest opinion," that such a state of facts exists. It is for the jury to say what state of facts exists, and this must be done by a consideration of all the evidence in the case, and such conclusion must not be reached by the honest or other character *1183 of opinion upon the part of the solicitor. In the annotation of the case of People v. Fielding, (N.Y.) 46 L.R.A. 641, 667 [158 N.Y. 542, 53 N.E. 497] note, it is said:
"`"The personal opinion of the prosecuting attorney as to the guilt of the accused is not evidence, and the sanction of such an opinion by the court is serious error."
"`"The right to a fair and impartial trial is violated by the misconduct of counsel in stating to the jury facts not in evidence because by so doing he fraudulently testifies without having been sworn as a witness." People v. McGuire, 89 Mich. 66 [64], 50 N.W. 786.'"
518 So.2d at 193-94. The King court then continued:
"In United States v. Lamerson, 457 F.2d 371 (5th Cir.1972), the court was confronted with a statement by the prosecutor vouching for the credibility of his witnesses. The prosecutor said, `I firmly believe what they said is the truth. I know it is the truth, and I expect you do, too.' The court held that when the prosecutor makes a statement which could be construed by the jury as implying that he has additional reasons for knowing that what the witness has said is true, which reasons are not known to the jury, such comment is no longer mere indiscretion but constitutes reversible error. The court noted that because the prosecutor said, `I know it is the truth,' the inference was made that he had outside knowledge and, thus, that the prosecutor had overstepped the bounds of propriety. Lamerson, at 372. The prosecutor in Lamerson was giving the jury the impression that he knew something the jurors did not know and which proved the defendant's guilt.
"The prosecutor in the instant case went far beyond the simple statement in Lamerson. As noted above, the prosecutor here said, `And I do vouch for what my witnesses have said to you. I believe they have been completely honest....' `They didn't lie about anything. They did what they told you they did.'

"Gradsky v. United States, 373 F.2d 706 (5th Cir.1967), held that it is `dangerous business' for the government to vouch for the honesty or veracity of its witnesses. In the instant case the prosecutor said, `... the State vouches for what its witnesses say when they put them on the stand.' In both Gradsky and Lamerson, reversal was required because `the prosecutor's expression might reasonably [have led] the jury to believe that there [was] other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt.' Gradsky, at 710. See also, Dunn v. United States, 307 F.2d 883 (5th Cir.1962).
"The Alabama Supreme Court has recently firmly condemned statements by the prosecution which suggest and might lead the jury to believe, that there was other evidence, not presented to them, which would prove the defendant's guilt. Ex parte Washington, 507 So.2d 1360 (Ala.1986)....
"....
"... With respect to improper statements by prosecutors, the position of our Supreme Court in Ex parte Washington, condemning statements that imply or suggest that there is additional evidence, not introduced, which could prove defendant's guilt, appears to closely mirror the position of the United States Fifth Circuit Court of Appeals in Gradsky and Lamerson. Accordingly, in reliance on this authority, we find that the statements by the prosecutor in which he vouched for his witnesses' credibility might reasonably have led the jury to believe that there was other evidence, unknown or unavailable to them, on which the prosecutor was convinced of petitioner's guilt. The prosecutor's argument was, therefore, not acceptable argument and was highly prejudicial."
Id. at 194-95 (emphasis in original).
Defense counsel should also avoid what amounts to unsworn, unchecked testimony.
"It is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds.

*1184 Just as the conduct of prosecutors is circumscribed, `[t]he interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders.' Sacher v. United States, 343 U.S. 1, 8 [72 S.Ct. 451, 455, 96 L.Ed. 717] (1952). Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case. See, e.g., ABA Model Code of Professional Responsibility DR 7-106(C)(3) and (4) (1980) ...; ABA Model Rules of Professional Conduct, Rule 3.4(e) (1984)."
United States v. Young, 470 U.S. 1, 8-9, 105 S.Ct. 1038, 1042-43, 84 L.Ed.2d 1 (1985).

B.
The prosecutor made the following comments during the guilt phase:
"Who was Troy Wicker. You remember his wife got up here and testified that they had two small boys, Anthony and Dewayne. Those boys don't have a daddy any more because somebody snuffed his life out. Do you remember what Dr. Aguilar said about the exploding of a bullet. It was a burning process. That lead projectile was fired through his skull, severing his brain stem. That's the reason Troy Wicker is not here today. That's the reason those boys don't have a daddy any more to spend time with them and take them places and take them to the ballgame and carry them to school. They don't have their daddy any more because the act of this defendant snuffed out his life.
"... You know, I haven't seen too many little boys that just didn't love their daddy. Regardless of what kind of person he was, regardless of the trouble that he might have been in, they don't have their daddy. They won't ever see their daddy again because when you kill somebody that's permanent.... Troy Wicker is gone."
The prosecutor also made reference, in closing argument during the sentencing phase, to the victim's sons' loss of the companionship of their father. (In addition, he elicited from Wicker, on cross-examination during the sentencing phase, that her sons loved their father.)
Similar comments, during a jury trial, have been held to be "highly improper and... calculated to inflame the minds of the jury." Lowman v. State, 38 Ala.App. 612, 614, 91 So.2d 697, 699, cert. denied, 265 Ala. 698, 91 So.2d 700 (1956) (wherein the court reversed a conviction because of the prosecutor's references to the "widow and a bunch of little children being left to raise" and "his wife and six kids left and hungry"). We find most apropos the following discussion in Thomas v. State, 18 Ala.App. 268, 271, 90 So. 878, 880 (1921), wherein the court reversed a conviction of second degree murder for the prosecutor's comment, "We have got to stop this business of running around making widows and orphans":
"The vital issue in this case was whether or not the defendant took the life of deceased in an unlawful manner.... It thus became a question of fact for the jury to determine, and in so determining, the issues involved should be submitted to the jury free from any appeal to prejudice or other improper motive. If as a consequence of this unfortunate homicide it resulted, as may be judged from the record, that a widow and orphans were left to mourn the death of deceased, this fact of itself could shed no light upon the issues involved, and the defendant's cause should not be burdened by unauthorized statements of this character, for the law makes no distinction in matters of this nature. A man with wife and children can be accorded no more rights under the law than a man without such wife and children, and that an expression of this character might be calculated to highly prejudice the minds of the jury under given circumstances and conditions cannot be doubted. It often happens that in trials of this character the loved ones of the deceased and the defendant appear in court and sit with counsel inside the bar, and in the presence of the jury many pitiable scenes are thus depicted. And in such surroundings *1185 impassioned arguments by counsel, accompanied by such unauthorized statements ..., are certainly calculated to engender unduly the sympathies of the jury on the one hand, or to inflame their minds with prejudice and passion upon the other hand. Such unauthorized remarks have no place in a trial where on the one hand a defendant's life or his liberty is involved, and on the other the proper administration of the law is concerned."
See also Rogers v. State, 275 Ala. 588, 157 So.2d 13, 18 (1963) (wherein the court reversed on its holding that the prosecutor's argument to the effect that the defendant had deprived the victim's wife and children of his companionship was "certainly calculated to engender unduly the sympathies of the jury on the one hand, or to inflame their minds with prejudice and passion upon the other hand").
We further point out that comments of this type may violate the Eighth Amendment's "cruel and unusual punishment" clause. See Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

C.
During the sentencing phase, the prosecutor remarked that Arthur will kill again if given the chance. "These comments were proper because they concerned the valid sentencing factor of [Arthur's] future dangerousness." Tucker v. Kemp, 762 F.2d 1496, 1507 (11th Cir.1985) (citing Brooks v. Kemp, 762 F.2d 1383, 1411 (11th Cir.1985), vacated on other ground, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986)). However, the prosecutor cannot allude to the possibility of probation and parole. See Ex parte Rutledge, 482 So.2d 1262, 1264-65 (Ala.1984). "[I]t has long been the law of this State that comments upon the probability or possibility of what might happen under a particular sentence, falling outside the evidence and the law of the case, constitute improper argument." Id. at 1265. Such an argument goes beyond a comment about the future dangerousness of Arthur. See Tucker, 762 F.2d at 1508. In this case, the prosecutor should not argue that the death penalty is the only way Arthur cannot manipulate his way back into the work release program. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (wherein the Court concurred in the lower court's condemnation of the prosecutor's remarks to the effect that the death penalty is the only way to insure that the defendant, who had murdered while on a weekend furlough from prison, would not ever be "out on the public" again).
The prosecutor also commented, in the sentencing phase, that the prison officials were partly to blame by putting Arthur on the work release program. The Supreme Court also noted its disapproval of this kind of argument in Darden v. Wainwright.

D.
In reviewing other comments to which Arthur now objects, we note the following established rules of law. "[T]he law is clear that a prosecutor should never express his personal opinion as to the guilt of the accused as such expression invades the province of the jury." Crosslin v. State, 446 So.2d 675, 680 (Ala.Cr.App.1983). Moreover, the prosecutor is in error, in exhorting the jury to "do its job," to imply that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law. See United States v. Young, 470 U.S. at 18, 105 S.Ct. at 1047. "[T]hat kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice, see, e.g., ABA Standards for Criminal Justice 3-5.8(c) and 4-7.8(c) [which provide that a prosecutor and a lawyer, respectively, `should not use (or make) arguments calculated to inflame the passions or prejudices of the jury']." Id. The prosecutor also cannot imply to the jury that he or his office had already made the judgment that this case, above most other capital cases, warrants the death penalty. Brooks v. Kemp, 762 F.2d at 1410. "This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecutor's viewpoint." Id. In addition, "it is wrong to *1186 imply that the system coddles criminals by providing them with more procedural protections than their victims." Id. at 1411. Finally, comment on the defendant's failure to testify is to be scrupulously avoided. See § 12-21-220. In the event of a retrial in which Arthur makes a statement in summation to the jury, see State v. Johnson, 121 Wis.2d 237, 358 N.W.2d 824 (1984), review denied, 122 Wis.2d 783, 367 N.W.2d 223 (1985), for guidance on the determination of whether his protection under § 12-21-220 and the Fifth Amendment is waived.
We conclude our view of the prosecutorial arguments with the following observation:
"[The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigorindeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to being about a just one."
Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The prosecutor, in addressing the jury, should limit his comments to the evidence and reasonable inferences therefrom.

V
In regard to other issues raised, because this cause is being reversed, we restrict our discussion to the following: On the issue of whether a white defendant can assert a Fifth Amendment challenge to the prosecutor's exclusion of black venirepersons, see Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), particularly the dissent of Justice Marshall. In regard to the issue concerning the restraining of Arthur by handcuffs chained to a waist chain and by shackles, we note that, during the trial, Arthur was also guarded by six to eight armed guards in the basement courtroom that had only one unlocked exit, which was guarded by five armed uniformed guards. In the event of a retrial with similar security measures, the trial court should state, for the record, why both the physical restraints of Arthur and the presence of so many armed guards are necessary. In regard to the issue concerning the handcuffing of a defense inmate witness during his testimony when none of the prosecution's inmate witnesses were similarly restrained (although one had possibly more than 50 convictions and had been imprisoned since 1967, with the exception of a total of 2 years), in the event of a retrial, the trial court should note, in the record, the reason for restraining or not restraining each inmate witness. Moreover, efforts should be made to alleviate, or at least minimize, any opportunity for the jury to see the inmate witness's restraints; for example, the trial court could order a recess before and after the witness's testimony so that the witness can be seated and removed from the witness stand outside the jury's presence. In regard to the foundational requirements for the introduction of work release records and phone bills, see §§ 12-21-43 and -44; C. Gamble, McElroy's Alabama Evidence §§ 254.01,.01(3), .01(5), and 214.01 (3d ed. 1977), and particularly for the admission of the phone bills, see 7 A.L.R.4th 8, §§ 2, 6 (Admissibility of Computerized Private Business Records).

VI
In our review of the trial proceedings for plain error, we note the following question and answer during the prosecutor's redirect examination of Wicker:
"Q ... Do you know of anybody besides yourself or [Rowland or McKinney] who could have supplied the same information that you have given today in court?
"A My mother." *1187 Wicker's mother did not testify. This question calls for patently illegal hearsay. We find it particularly offensive here, since Wicker's credibility was repeatedly called into question and, also, since much of her testimony was not corroborated by any witness.
We further note that Arthur was not present at the hearing on his petition for psychiatric examination; however, see Rule 9.1, of the proposed Alabama Rules of Criminal Procedure.
In our cursory review of the trial court's oral charge, we observed that, although the indictment charged that Arthur "unlawfully and with malice aforethought" killed the victim, the trial court never once mentioned those terms, but charged on intentional murder, which was not specifically charged in the indictment.
We further point out that in instructing the jury, in the sentencing proceeding, on the nonstatutory mitigating circumstances, the court gave an incomplete charge, for it failed to instruct that "mitigating circumstances shall include ... any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death," § 13A-5-52.
Based on the foregoing, the judgment is due to be, and it is hereby, reversed, and the cause is remanded.
REVERSED AND REMANDED.
All Judges concur.

ON APPLICATION FOR REHEARING
PATTERSON, Judge.
On rehearing, the attorney general, in his main argument urging this court to withdraw our opinion of May 25, 1990, and to affirm this cause, contends that we misapplied Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). He asserts that the following facts clearly distinguish this cause from Arizona v. Roberson "to such a large extent that the holding of Roberson is misapplied": Arthur was not in custody because of an arrest or because he was suspected of a crime, but because he was an inmate in the Alabama prison system; he was not the subject of a criminal investigation, but was merely under investigation for "a potential corrections disciplinary violation"; the interviewing officer, Corrections Officer Patrick Halladay, is a shift supervisor at the work release center, not a law enforcement officer; and Arthur had no constitutional right to counsel in a prison disciplinary investigation. The attorney general appears to be asserting that a prison inmate who seemingly is, at the time, under investigation for a possible prison disciplinary regulation violation, but not yet a definite suspect in a criminal investigation, and who is questioned by a corrections officer need not be advised of the warnings of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Even though this argument is asserted here for the first time, involves issues of first impression in this state, and is the main thrust of the attorney general's argument on rehearing of a death case, not one specifically pertinent case has been cited in support of this proposition.
The Miranda warnings are necessary when a person is subjected to custodial interrogation, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," id. at 444, 86 S.Ct. at 1612 (footnote omitted). The person questioned is not in custody within the meaning of Miranda unless the questioning occurs "in a context where [his] freedom to depart [is] restricted in any way," Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). The Miranda rule was held applicable in a prison setting, by the Supreme Court, in Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). There, the Court held that the statement given by Mathis, a state inmate, pursuant to questioning by an Internal Revenue Service investigator in a "routine tax investigation," should not have been used in a subsequent criminal prosecution, because Mathis was entitled to Miranda warnings prior to the questioning and had not been warned. In so ruling, the *1188 Court rejected the Government's arguments that (1) the questioning was pursuant to a routine tax investigation where no criminal proceedings might ever be brought and (2) Mathis was in custody for an entirely separate offense. The Court explained, "These differences are too minor and shadowy to justify a departure from the well-considered conclusions of Miranda with reference to warnings to be given to a person held in custody." Id. at 4, 88 S.Ct. at 1505.
We do not find Mathis to mandate a per se rule that any investigatory questioning inside a prison requires Miranda warnings. In rejecting such an interpretation, we agree with the rationale of Cervantes v. Walker, 589 F.2d 424, 427 (9th Cir.1978):
"Such a rule could totally disrupt prison administration. Miranda certainly does not dictate such a consequence. `Our decision is not intended to hamper the traditional function of police officers in investigating crime.... General on-thescene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.' Miranda v. Arizona, supra, 384 U.S. at 477 [86 S.Ct. at 1629]....
"Adoption of [a per se rule] would not only be inconsistent with Miranda but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart. We cannot believe the Supreme Court intended such a result. Thus, while Mathis may have narrowed the range of possible situations in which onthe-scene questioning may take place in a prison, we find in Mathis no express intent to eliminate such questioning entirely merely by virtue of the interviewee's prisoner status. [Footnote omitted.]"
See also Illinois v. Perkins, ___ U.S. ___, ___, 110 S.Ct. 2394, 2398, 110 L.Ed.2d 243 (1990) (wherein the Court noted, after discussing Mathis v. United States, that "[t]he bare fact of custody may not in every instance require a warning"). In recognizing "that a prison inmate is not automatically always in `custody' within the meaning of Miranda," United States v. Conley, 779 F.2d 970, 973 (4th Cir.1985), cert. den. 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986), we hold that "custody" or "restriction" in the context of prison "necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement," id. (quoting Cervantes v. Walker, 589 F.2d at 428). "Thus, whether an inmate is `in custody' under Miranda depends on the circumstances of the case." United States v. Cooper, 800 F.2d 412, 414 (4th Cir.1986). See also Cervantes v. Walker, 589 F.2d at 428 (wherein the court stated that, in determining whether the prisoner is in custody, four factors should be considered under the objective, reasonable person standard: "the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him"). We find that Miranda v. Arizona "applies to prison inmates to the same extent that it does to all other citizens," Whitfield v. State, 287 Md. 124, 411 A.2d 415, 423, cert. dismissed, 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850 (1980).
Under the instant circumstances, Arthur was clearly in "custody" for purposes of the Miranda rule. He had been removed from the work release center and placed in the county jail, pending investigation of the discrepancy between his hours worked and his earnings submitted to prison authorities, his prohibited possession of $2,000 cash, and his possession of jewelry. His freedom of movement was clearly further curtailed. Under these circumstances, we find that "a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prison setting," Cervantes v. Walker, 589 F.2d at 428. In fact, we consider that Arthur's change in custody was a "`restraint on freedom of movement' of the degree associated with a formal arrest," California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting Oregon v. Mathiason, 429 U.S. at *1189 495, 97 S.Ct. at 714). See also Rossi v. State, 506 So.2d 1136 (Fla.Dist.Ct.App. 1987) (wherein the court ruled that Rossi was in custody when he was taken to a corrections officer's office and, once there, was not free to leave until released). Compare United States v. Cooper, 800 F.2d at 414 (where, upon the prisoners' request for an interview, they were moved to an "inherently less restrictive area" and questioned); United States v. Conley, 779 F.2d at 973-74 (where, when the prisoner was in a prison conference room for the purpose of waiting to be transferred to the infirmary for medical treatment and not for the purpose of being interrogated, he was questioned briefly after he initiated conversation).
The attorney general's alternative argument asserting that Arthur was not in custodythat Arthur was not the subject of a criminal investigation, but was merely under investigation for a possible violation of a prison disciplinary regulationis likewise without merit. Whether the person questioned has become the focus of a criminal investigation is not determinative of the question of custody. See Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (wherein the Court rejected the petitioner's claim that he was in custody and was entitled to Miranda warnings when he was interviewed at home by an IRS agent, because he was at that time the focus of a criminal investigation); 1 W. LaFave and J. Israel, Criminal Procedure § 6.6 at 1990 Pocket Part, p. 88 (1984) (wherein it is noted that "[j]ust as the presence of `focus' is not sufficient to invoke Miranda when custody is lacking, Miranda is not somehow rendered inapplicable to questioning of a suspect who is in custody just because `focus' is lacking") (footnote omitted; emphasis in original). Moreover, as previously noted, the Supreme Court in Mathis, 391 U.S. at 4, 88 S.Ct. at 1504, held that whether Miranda warnings are required does not depend on the reason why the questions were asked at the time.
We also find no merit in the attorney general's argument that Arthur was not due the Miranda warnings because his interrogator, a shift supervisor at the work release center, was not a law enforcement officer for purposes of the Miranda mandate. See, e.g., Rossi v. State, 506 So.2d 1136 (Fla.App. 2 Dist.1987) (Miranda warnings required prior to custodial interrogation of inmate by two corrections officers); People v. Diesing, 67 Ill.App.3d 109, 23 Ill.Dec. 781, 384 N.E.2d 575, 577 (1978) (Miranda safeguards should have been given to prisoner interrogated by work release supervisor in the county jail); People v. Grevious, 119 Mich.App. 403, 327 N.W.2d 72 (1982) (Miranda applicable to interrogation by prison farm supervisor and two corrections officers); People v. Faulkner, 90 Mich.App. 520, 282 N.W.2d 377, 380 (1979) (Miranda warnings should have prefaced custodial interrogation by director of halfway house designated by Department of Corrections as residence for prisoners classified to community status because as an "authorized representative of the director" of the department, "he certainly acts `in concert with or at the request of police authority[,]' People v. Omell, ... 15 Mich.App. [154,] 157, 166 N.W.2d [279,] 281 [(1968)]"); Walker v. State, 102 Nev. 290, 720 P.2d 700, 701 (1986) (a correctional classification officer, who investigates offenses by inmates and sits on disciplinary committees, is "a law enforcement officer" for purposes of Miranda); Commonwealth v. Chacko, 500 Pa. 571, 459 A.2d 311, 315 n. 3 (1983) (Miranda warnings should have preceded questioning of inmate by State Correctional Institute's director of treatment).
In holding that Arthur was due to be advised of the Miranda safeguards and to have the assertion of any of those rights honored, we conclude with the following:
"Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *1190 Miranda v. Arizona, 384 U.S. at 467, 86 S.Ct. at 1624 (emphasis added).
In answer to the attorney general's apparent argument that, since Arthur was not entitled to counsel in a prison disciplinary investigation, it mattered not that he asked for counsel, we recognize that, in Wolff v. McDonnell, 418 U.S. 539, 570, 94 S.Ct. 2963, 2981, 41 L.Ed.2d 935 (1974), the Court did hold that inmates do not have "a right to either retained or appointed counsel in disciplinary proceedings." In Baxter v. Palmigiano, 425 U.S. 308, 315, 96 S.Ct. 1551, 1556, 47 L.Ed.2d 810 (1976), the Court expounded upon its holding in Wolff by rejecting the lower court's ruling that Miranda and Mathis require that prison inmates be provided representation at prison disciplinary hearings where the charges involve conduct punishable as a crime because statements the inmates might make in the hearings would possibly be used in later prosecutions for the same conduct. The Court explained that "[n]either Miranda, supra, nor Mathis, supra, has any substantial bearing on the question whether counsel must be provided at `[p]rison disciplinary hearings [which] are not part of a criminal prosecution[,]' Wolff v. McDonnell, supra [418 U.S.], at 556 [94 S.Ct. at 2975]," and held that the inmate does not have to be advised "that he [is] entitled to counsel at the hearing and that the State [will] furnish counsel if he [does] not have one of his own." 425 U.S. at 315, 96 S.Ct. at 1556. However, the Court cautioned that "if inmates are compelled in those proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered `whatever immunity is required to supplant the privilege' and may not be required to `waive such immunity[,]' [Lefkowitz v. Turley, 414 U.S. 70,] 85 [94 S.Ct. 316, 326, 38 L.Ed.2d 274 (1973)]." 425 U.S. at 316, 96 S.Ct. at 1557. Thus, if the state desires to use the inmate's testimony over his Fifth Amendment objection, it must extend "whatever use immunity is required by the Federal Constitution," id. at 318, 96 S.Ct. at 1558.
One commentator has explained the application of Miranda to the inmate custodial interrogation situations as follows:
"The situation might arise, for instance, where a prison official, seeking to investigate an alleged rule infraction, questions an inmate who is believed to possess relevant information. Under these circumstances, does the inmate have the right to Miranda warnings?
"It is settled that Miranda applies to an inmate who is interrogated in regard to a criminal offense unrelated to a prison disciplinary proceeding. [See Mathis]....

"Conversely, the reasoning of Baxter certainly suggests that Miranda does not apply to interrogations relating to an internal disciplinary proceeding. Since Miranda is based on a Fifth Amendment analysis, and since under Baxter an inmate's Fifth Amendment interest is adequately vindicated by a grant of use immunity at a subsequent criminal trial, the prisoner has no right to remain silent at a disciplinary hearing, without the resulting adverse inferences. Since Miranda thus does not apply at the disciplinary hearing, it would seem to follow a fortiori that it should not apply at a pre-disciplinary hearing investigation and it has been so held.
"Thus, it appears that Miranda applies where the government investigation relates to a criminal trial but not where it relates to internal disciplinary proceedings. But what of the in-between case where a defendant's response at a disciplinary proceeding, where Miranda warnings are not given, is subsequently used at a criminal trial? In Grant v. State, 154 Ga App 758, 270 SE2d 42 (1980), a Georgia court held that a plea of guilty entered at a disciplinary hearing was inadmissible at a subsequent criminal trial absent a Miranda warning at the disciplinary hearing. See also People v. Carr, 149 Mich App 653, 386 NW2d 631 (1986) (Miranda inapplicable to admissions made at disciplinary hearing, but such statements cannot be used at a subsequent criminal trial on the underlying offense except for impeachment *1191 or rebuttal; inmate must be advised of these effects before testifying at hearing)."
J. Gobert & N. Cohen, Rights of Prisoners § 8.06 (1981 & 1990 Cumulative Supp.). See also Whitfield v. State, 411 A.2d at 423 (wherein the court noted that if the state decised to procure an inmate's statement without the inmate's having the benefit of Miranda warnings, it does so at "the cost of forgoing the affirmative use of this information at a subsequent criminal trial").
Thus, we agree with the attorney general that Arthur had no right to counsel at any pre-disciplinary hearing investigation or disciplinary proceeding, and that Arthur did not have to be so advised. However, without the warnings and compliance with them, any subsequent statement by Arthur could not have been used in his criminal prosecution. Warnings were given, and Arthur asserted one of his Miranda rights. The assertion of that right should have been honored.
For the above-stated reasons, we overrule the attorney general's application for rehearing and deny his motion for a statement of additional facts, A.R.App.P. 39(k).
OPINION EXTENDED; APPLICATION OVERRULED; A.R.App.P. 39(k) MOTION DENIED.
All Judges concur.
NOTES
[1] The indictment charged that appellant "did, unlawfully and with malice aforethought, kill Troy Wicker, Jr., by shooting him with a pistol; after having been convicted of murder in the second degree on to-wit: August 16, 1977 in the Circuit Court of Marion County, Alabama."
[2] Judy Wicker did not testify in Arthur's first trial. However, Theresa Rowland testified in the first and did not testify in this trial. Because the same witnesses did not testify in both trials, we do not refer to the facts as set out in our review of Arthur's first conviction and sentence of death.
[3] Hereinafter Judy Wicker will be referred to as "Wicker" and her husband, Troy Wicker, Jr., will be referred to as "the victim."
[4] We note that the prosecutor was aware that the evidence of the statements was subject to objection, for during a sidebar about prosecutorial comments about the statements, the prosecutor stated, "We kept waiting on [an objection] and it never came."
[5] We have not concerned ourselves with the questions of whether each issue, upon which we are commenting, was properly preserved for our review.
[6] In commenting upon these prosecutorial remarks, we have not concerned ourselves with whether they were a reply-in-kind to earlier argument of opposing counsel. In United States v. Young, 470 U.S. 1, 12-13, 105 S.Ct. 1038, 1044-45, 84 L.Ed.2d 1 (1985), the Court emphasized that the reply-in-kind doctrine is not used to excuse prosecutorial misconduct, but is for examining the conduct in the context of the trial and determining whether the comments "did no more than respond substantially in order to `right the scale.'"